Statement of the Case.
This is an appeal from a judgment of conviction for manslaughter in the first degree rendered against the defendant, George Valentine, in the district court of Kiowa county, wherein he was convicted of having shot and killed one Ray Phifer, and sentenced to serve a term of eight years' imprisonment in the state penitentiary.
This killing occurred on the night of the 25th day of March, 1917, near the Semone or Arkansas Bend schoolhouse in the eastern part of Kiowa county. The defendant, George Valentine, was a farmer, living at that time about 100 yards north of said schoolhouse. He was about 47 years of age, and had a wife and four living children, one of whom, Clemmie Valentine, was a young lady about 16 years of age at the time of this homicide. The deceased, Ray Phifer, was a farmer boy about 19 or 20 years of age, and lived some four or five miles southwest of the defendant. *Page 78 
Young Phifer had been paying attention to Clemmie Valentine, and the relations between them had become intimate. As a result of such illicit relations, Clemmie Valentine, it is claimed, became infected with a venereal disease, which fact was communicated to her father, George Valentine, the defendant, some 35 or 40 days before the commission of this homicide. Whereupon, he took his daughter to a physician for purposes of physical examination, and was informed by such physician that his daughter was then suffering from the disease called gonorrhea. Neither the daughter nor the defendant testified that the defendant was told that the deceased was responsible for the daughter's condition, although the daughter testified that she had on two occasions, once in the late fall or early winter of 1916, and again in the early part of 1917, had sexual intercourse with the deceased, and that the deceased had been keeping company with her over the objections of her parents.
The defendant testified that the attentions of the deceased to his daughter were objectionable to him, and that after he learned that his daughter was infected with a venereal disease the matter preyed upon his mind to such an extent that he suffered from lapses of memory, and at times did not know what he was doing. In this connection, the defendant also testified that he had a sister who died insane, and an uncle, a brother to his father, and also a cousin to his mother, who each died insane, and that he had also another cousin who suffered from epileptic fits. The defendant also testified that some years previous to the commission of the homicide, and before his marriage, he suffered an injury to his back from a fall from a horse, and at another time an injury to his head from a similar fall. On the question of insanity there was also other evidence, both lay and expert, to the effect that the witnesses considered the *Page 79 
defendant insane at the time of the commission of the homicide, but the extent of such insanity or its continuation either before or after the commission of the homicide is not developed in the evidence.
One of the defenses interposed was insanity; another was self-defense. On the latter theory of his defense, the defendant testified that the deceased, Ray Phifer, had been ordered by the defendant to stay away from his premises and to cease paying attention to his daughter, Clemmie; that the deceased paid no attention to these admonitions given him by the defendant, but continued to pay his attentions to defendant's daughter.
On the Saturday night before the homicide on Sunday night, Clemmie Valentine left home to spend the night with her friend, Lillian Fielden, who lived about a mile east. After she had gone to Fielden's, Olen Valentine, the son of the defendant and a codefendant who was acquitted at the trial, noticed a Ford car pass the road in front of their house going east, and he took one of the occupants of the car to be the deceased, Ray Phifer. Olen Valentine then went and informed his father that he believed Ray Phifer had gone up to Fielden's to meet Clemmie. Upon being informed of this fact, George Valentine, Olen Valentine, and a young man who was staying in the Valentine home, Carl Byers, got into a Ford car and started out in pursuit of Ray Phifer. Phifer, it appears, had previously arranged to meet Clemmie Valentine at Fielden's on this night, and when he called at Fielden's house he requested Clemmie to go to a picture show with him. Clemmie declined to go unless her friend, Lillian Fielden, would go with her, and Lillian declined to go unless her brother, Sylvester Fielden, also went along. Finally it was agreed that they should all go, and Ray Phifer, Sylvester Fielden, Lillian Fielden, and Clemmie Valentine started away *Page 80 
from the Fielden home in a Ford car ostensibly to go to a picture show. When they got out on the public highway near Fielden's, John Burdock, another young man, was waiting for them, he having gone up there with Phifer in the first instance but not having gone into the house. Burdock was taken into the car, and it was then agreed that it was too late to go to a picture show, but that they would all take an automobile ride.
They proceeded west from the Fielden home a distance of a little over three miles, turning south at a road near the premises of Charles Johnson, at which point they ran out of gas and sustained a puncture to one of the tires on the car. While they were at this point, the Valentines and Carl Byers overtook them, George Valentine, the defendant, being at this time armed with a Winchester repeating shotgun, the same weapon afterwards used in accomplishing the killing.
Upon his arrival at the scene of the breakdown, George Valentine inquired of Phifer and Burdock and Sylvester Fielden if Clemmie Valentine was with them, but was informed that she was not with them, although Clemmie Valentine and Lillian Fielden were then hiding, concealed between the front and rear seats of the car. After receiving such information, the Valentines and Byers turned their car around, and started back in the same direction from which they had come. George Valentine, however, got out of the car and hid under a traction engine not far distant from the scene of the breakdown. Olen Valentine and Carl Byers proceeded back to the Valentine home, procured Mrs. George Valentine, and then went to the Fielden home, where they were informed that Clemmie Valentine had accompanied Ray Phifer from the Fielden house in a Ford car. Upon receiving this information, Mrs. Valentine, Olen Valentine, and *Page 81 
Carl Byers returned to where George Valentine had been in hiding.
While George Valentine was hiding, he heard voices down at the Phifer car, and recognized one as that of his daughter, Clemmie. Clemmie and Lillian Fielden got out of the car, however, and walked back to the Fielden home. After they had departed, the Valentines again returned to the scene of the breakdown, and then learned from Sylvester Fielden that the girls had been there when the Valentines first came up but had left for home. By this time, Phifer and Burdock had repaired the car, and Phifer had gone to the home of Charlie Johnson and got some gasoline, and they (Phifer and Burdock) drove away together in a southerly direction. Sylvester Fielden was taken in by the Valentines and returned with them to his home, where it was learned that the girls had returned. After receiving such information, the Valentines repaired to their home. By this time it was midnight or later.
Clemmie Valentine stayed all night with the Fieldens, and all day Sunday, and Sunday evening she attended the church services then being conducted in the Semone schoolhouse. On this occasion she was accompanied by Lillian Fielden, Mrs. Fielden, and other members of the Fielden household. At the services she first saw her father, George Valentine, after Saturday night's escapade, but they did not sit together.
The first learned of Ray Phifer after Saturday night's escapade was on the occasion of his meeting up with Frank Sloan and Carter Barney, two young farmer boys who lived in his neighborhood, on Sunday afternoon. Sloan and Barney were driving a single buggy in a southerly direction, and met Phifer, who was driving a single buggy in a northerly *Page 82 
direction. Sloan and Barney had determined to attend a ball game at Sedan, but after meeting Phifer they all three concluded to attend the church services at the Semone schoolhouse, in which direction Phifer was then headed. This agreement was reached at the suggestion of Phifer, and after it was agreed to go there the boys went to Mr. Barney's house, put a pole to one of the single buggies, hitched both horses to it, and all three then proceeded in a northerly direction toward Semone schoolhouse. It being somewhat early in the afternoon, the boys stopped at the home of Mr. McMichael and visited a short time, after which they drove into the town of Carnegie, and there fed their team and ate supper, leaving Carnegie for the services at Semone schoolhouse about 8 o'clock in the evening.
Upon arriving at the schoolhouse, it was found that the services had commenced, that they were late, and they concluded not to go into the schoolhouse, and all of them, with the exception of Phifer, got into a Ford car which was parked near the schoolhouse, and after they had got into the car one of the McMichael boys came out and was talking with them. Phifer, it appears, went up to the schoolhouse, and when his presence became known there Clemmie Valentine got up and left the church services. After leaving the schoolhouse, she was met by Phifer and a conversation took place between them, in which Clemmie says that Phifer asked her how she got home the evening before, and also wanted her to go out with him again that evening, but that she refused and went on to her home, about 100 yards distant. Phifer then went and sat down in the car with the rest of the boys.
A short time thereafter, George Valentine left the schoolhouse, also before services were concluded, and came out to where the boys were sitting in the car. He talked crop conditions with them, saw Phifer at that time, but made no *Page 83 
demonstration towards him nor had any conversation with him with reference to what occurred the evening before, or with reference to his attentions to his daughter, Clemmie.
After the services were concluded, the three boys, Phifer, Barney, and Sloan, got into their buggy and started west towards their homes. George Valentine went home and was there informed by his son, Olen, that Phifer had been talking to Clemmie at the schoolhouse. What occurred after that is detailed by the defendant as follows:
"A. * * * My boy says, `Papa, do you know that that boy got hold of Clemmie over there and wanted her to leave with him again?' I says, `For God's sake, what are we going to do?' I says, `Go and get the car and I'll overtake that gentleman and give him one more warning to stay away from my place — that's just what I'll do.' The boys went across the lot and got the car and when they drove up there the light was out on the right hand side of this car — wasn't burning. I hollered for my wife to bring the lantern there. I and Carl Byers and Olen fixed the light; I don't know who set the lantern over in the car, whether my wife set it in or I set it in, or Olen or Carl, but anyway the lantern was set over in the car and we started to overtake Ray Phifer. We went, I suspect, about two miles and a quarter. Q. Now, before you started there did you know that there was — that the shotgun was in the car? A. I did not. Q. Was the shotgun, in fact, in the car? A. The shotgun was in the car on Saturday night when we come from Mountain View and wasn't removed out of the car that I know anything about. Q. Well, it was in the car, in fact? A. Yes, sir. Q. When did you first find out it was in there? A. That Sunday evening. Q. That is after you started out up the road? A. I should guess that we was three-quarters of a mile, maybe — possibly more — and I stooped over to pick up a lap robe — a lap robe laid in the car, to pull over my lap and that gun was lying under that lap robe in the car; the first of my knowing that gun was in the car. Q. How was the gun loaded, if at all? A. It wasn't at that time. Q. Did *Page 84 
you have any shells? A. There was two shells in this gun; just like it was Saturday night. Q. Was the shells in the gun or magazine? A. It was in the magazine. Q. How many? A. Two. Q. Did you have more shells than two? A. I had — no, sir; not number twelve shells — I had one number ten shell — two is all I had. Q. Where did you get these shells? A. I got this shell from Willie Norman the night I got this cussin' at my house. I got five. Q. What became of the other shells? A. My son fired three of these shells the night he was charivaried there at my house — one of these shells was a number ten. Q. Where was that number ten shell? A. It was in the dresser drawer in my house. Q. Well, you started up the road, west? A. Yes, sir. Q. How far did you go in that direction? A. We went about two miles and a quarter, I guess, and come to this buggy — no, we passed a team and wagon, I believe, before we got there — I believe we passed a buggy and a wagon, but I won't say, but anyway we come to this buggy, driving along in a trot. Drove on by them and I says, `that's not him' — we must have went half a mile, I guess, or possibly not that far — I says, `The chances is that was him.' I says, `Turn around, Olen, we'll go back'; we turned around and went back and as we went back decided that it was him — we went back possibly 50 yards or 60. I says, `We'll go back up and see him.' I says, `I have come up to give him a talking to,' and — By the Court: Talk a little louder, I don't believe the jury can hear you. A. You gentlemen back there don't hear me? By a Juror: Not all of it. A. I says, `Turn around and drive up — I want to talk to him.' Olen drove up by the side of the car; I says, `Hold on there, Ray,' he was sitting on these other boys' laps; he just rose up like this and these two boys gave him a shove like this and one went out on the toe-board of the buggy — one of these boys went this way and one this way — the one that come out this way was within three feet of my car — the buggy wheel run over him. I thought Ray Phifer got out on the ground with these boys. I drew my attention over this way, thinking this was Ray Phifer on the ground, too; this boy rose up and directly I *Page 85 
heard a voice, `Look out, Dad, he's going to shoot — he's going to shoot.' I immediately whirled around and fired two shots towards the buggy. I says, `Get from here, Olen.' Q. Did you see Ray Phifer at the time you fired these shots? A. I could see nothing but the bulk of the buggy. Q. Had you seen him have any weapon prior to this time? A. Before this time? Q. Yes. A. No, I couldn't say that I ever saw him carrying any weapons. Q. Oh, no; before this time, at the shooting? A. Oh, yes, I saw the gun there at the buggy. Q. Was that before or — before the boys got out of the buggy? A. It was all the same collapse to me — that's the way it looked to me — I thought he went clear over the toe-board of the buggy when these boys pushed him. Q. Did you have any intention of shooting Ray Phifer when you went up there? A. I absolutely did not. Q. Did you have any intention of shooting him at the time you told him to stop? A. If that boy had spoke to me I would have talked to him like a man and told him for God's sake to stay away from my home. Q. Is that what you went there for? A. That's exactly what I went there for. Q. Mr. Valentine, what effect did it have upon you when you found out your daughter's condition? Counsel for the State: Objected to as incompetent, irrelevant, and immaterial. The Court: Overruled. Answer the question. A. Well, gentlemen, I don't think that I could express my feelings; I don't believe that I could do it; absolutely don't believe — it was such a shock that I could make no attempt to express the feelings to you men that that brought upon me. Q. It was a shock to you? A. Shock? Well, if a man had knocked me down it wouldn't have hurt half so bad."
What occurred at the time of the killing from the standpoint of the state's witnesses is told by Frank Sloan as follows:
"Q. Did you see George Valentine, Olen Valentine, and Carl Byers any more that night, after you left that schoolhouse? A. Yes, sir. Q. Where did you see them *Page 86 
at next time, Frank? A. About two miles and a quarter west of the Bend. Q. Do you know where Mr. Valentine lived from there? A. Yes, sir; he lived right north of the church or schoolhouse. Q. About how far from this Semone schoolhouse did he live at that time? A. I don't know; a couple of hundred yards, I suspect. Q. All right — then the next time you saw him about two miles or two and a quarter from the schoolhouse? A. Yes, sir. Q. How was he traveling? A. Car. Q. What kind of a car? A. Ford, I think. Q. Who was with him? A. Carl Byers and Olen Valentine. Q. What became of them? What did they do? Just tell the jury what was done from there out until — in your own way, Frank. A. Well, they drove ahead of us and turned around, went behind us and turned around and come up behind us and hollered, `Stop or I'll shoot,' and me and Carter jumped out. Q. Who and you? A. Carter Barney, and went — when I jumped out I stood there by the side of the car and told them not to shoot me and Ray — they — that stopped them from shooting, I suspect, for a while, and Ray turned the team across the road and went out in the listed field and he wasn't out there but a piece when they started to shoot. Q. Now, did you see the defendant, George Valentine, with any gun or anything? A. Yes, sir. Q. What kind of a gun? A. A shotgun. Q. What was Olen Valentine doing at the time? A. Driving the car. Q. What was Carl Byers doing, if anything? A. Holding the lantern. Q. Was he holding the lantern lighted? A. Yes, sir. Q. How many shots — you say after Ray Phifer turned out into the field Valentine commenced shooting? A. Yes, sir. Q. How many shots was fired, Frank? A. Three. Q. By whom? A. By Mr. Valentine. Q. About how far was Ray Phifer from Valentine at this time, when the shooting taken place? A. I don't know; I judged it to be about 50 yards that night; the rows might be closer or farther; I didn't measure it. Q. Was Ray in the buggy or was he out of it at that time? A. He was in the buggy as long as I could see him. Q. The last time you saw him he was in the buggy? A. Yes, sir. Q. Now, after the shooting what did the defendants *Page 87 
Valentine and Byers do, if anything? What became of them? A. They drove down the road about half a mile, I judge, and turned around and went back towards home. Q. What did you and Carter Barney do, if anything? A. Well, went out to the buggy. Q. What did you find after you got there? A. Found one horse standing up and the other one was laying down and there wasn't anybody there. Q. Could you find Ray anywhere? A. No, sir. Q. Ray Phifer? A. No, sir. Q. Did you look for him — hollow for him? A. Yes, sir. Q. Call to him? A. Yes, sir. Q. What did you do after you failed to find him? A. Well, we unhooked one horse and tied him to a wheel, and started for the — for a house and we went to one house and the fellow said he had the measles and couldn't help us, and he told us where Johnson lived, and then he said Norman, or — I don't know the name — another fellow lived south a half mile and Charlie Johnson lived north a half mile; we went up to Charlie Johnson's and got him and looked again for Ray. Q. Was you able to find him then? A. No, sir. Q. What did you do then? A. Hooked the team up and came home. Q. Who drove the team out? A. I did. Q. And what direction did you go out of there with that buggy, what direction? A. Went towards the road, north. Q. Went back north? A. Yes, sir. Q. Now, in turning did you turn to the east or turn to the west to get back north? A. Turned to the west. Q. Drove northwest? A. Yes, sir. Q. And went back to the section line east and west? A. Yes, sir. Q. Which was north of the field — what — where did you go from there? A. Went home — to Barney's. Q. Went to Mr. Barney's? A. Yes, sir. Q. Did you go to Ray Phifer's home that night? A. Yes, sir. Q. Did you report what had taken place, to his people? A. Yes, sir; we told Will Phifer. Q. A brother of his? A. Yes, sir. Q. Did you go back over there the next day? A. No, sir. Q. Did you go back Tuesday? A. No, sir. Q. Have you ever been back there since? A. No, sir; I have not. Q. Was there any one else present that you saw during this *Page 88 
shooting, except yourself, Carter Barney, and these three defendants here and Ray Phifer? A. No, sir."
The body of the deceased was found on Tuesday after the killing Sunday night. It was located about 200 yards south of the section line road where the deceased had fallen after leaving the buggy where the horse had fallen down, some 150 yards north of where the body was found. A post mortem examination was held; death being caused by two shot wounds that entered the body in the back, one on the left side and one on the right, below the respective shoulder blades, both of which shots evidently penetrated the lungs, the one on the left side being near the heart. Twenty-six indentations of shot were counted in the back of the buggy in which deceased was riding, and two large shot were picked out of the buggy.
On the 5th day of April, 1917, about 11 days after the homicide was committed, and after several parties had been on the premises searching for the body of the deceased and, after the body was found, searching for weapons, etc., a 38-caliber, dark handled pistol was found in one of the listed rows of the field about 11 steps east and a little bit north of where the buggy had turned around. This weapon was a dark handled, dark barreled pistol, and had four loaded shells and one empty shell in the cylinder.
Before the body of the deceased was found, on the Monday after the homicide, and after several officers had been at the scene of the homicide searching for the body of the deceased, a conversation was had between them and the defendant, in which defendant told them that the deceased, Phifer, had evidently run away; that he had not shot to hit him, but had only shot in the air to scare him, and that it was his, defendant's, opinion that Phifer would show up uninjured. *Page 89 
The foregoing statement contains the material evidence in this case. The record contains over 900 typewritten pages of evidence. The testimony on the part of the state would sustain a conviction of murder, and it is the candid opinion of the court, after reading this record very carefully, that there is no evidence which would justify the acquittal of the defendant on the ground of self-defense and that the evidence of insanity is of an unsatisfactory character and wholly deficient to meet the requirements of the previous decisions of this court to the effect that, before a person may be acquitted on the ground of insanity, there must have been a reasonable doubt that the defendant at the time of the commission of the act charged was mentally competent to distinguish between right and wrong, or to understand the nature of the act he was committing.
The deceased was killed at a time when he was endeavoring undoubtedly to escape from the defendant, or else he would not have turned the horses out of the public highway and onto the listed field where he knew it was practically impossible to follow him in the automobile. The only excuse offered for the shooting was that his son yelled, "Look out, Dad, he is going to shoot!" The defendant does not pretend that at the time he fired the shot the deceased was making any demonstration whatever towards him, or that he believed himself to be in imminent danger of death or serious bodily harm at the hands of the deceased. Indeed, the defendant's evidence would indicate that he was uncertain which one of the boys, whether one of the two on the ground or the one still in the buggy, was Ray Phifer.
The court, in instructing the jury, submitted both theories of the defense fully, fairly, and impartially, and more favorably than the evidence of the defendant would warrant. There is no contention in this case that the evidence *Page 90 
is not sufficient to sustain the verdict, nor that the instructions of the court were not fair to the defendant or were prejudicially erroneous in any particular.
It is first contended that the court erred in admitting the evidence of a certain conversation had between one Charlie Johnson and certain parties who were present at the time the pistol was found, which is alleged to have belonged to the deceased. In the direct examination of M.V. Shaw, a witness for the defendant, and one of the parties who made the search at the time the pistol was found, the following questions and answers were asked and made:
"Q. Did any other person or persons come there while you were searching the field? A. Well, there was a party stopped out at the road and come out about half way to where we were. Q. Do you know who that was? A. Yes, sir. Q. Who? A. Charlie Johnson. Q. He didn't come out? A. No, he didn't come clear to where we were. Q. Anything said to him about what was being done there? A. Yes, he called to me and told me to come to him, and I said, `No, you come here.' We were squatted down then around where the gun was. Q. He didn't come there? A. No, sir."
On cross-examination, the county attorney asked the following questions, and the respective answers were made thereto:
"Q. How long did you all sit down around that gun? A. Oh, I suppose five minutes, anyway. Q. What was said upon that occasion by any of you and by all of you? A. Well, we were just talking about the condition of the gun — the way it appeared. Q. What was done? A. I think I suggested, myself, that the gun had been there long enough for the metal part to be rusted and where there was a little grease settled around the cylinder that the dust and dirt had settled on it; been laying there for some time; I *Page 91 
think I suggested that myself. Q. Who else suggested anything? A. I don't know that. Q. Was that all there was said? A. No, there was quite a bit said. Q. What was it, Mr. Shaw? A. Oh, I don't think I could detail the conversation; we were sitting there talking about it; I was discussing the condition of the gun and talking about it, at the time this Mr. Johnson come up there and called me. Q. Mr. Johnson? Charlie Johnson? A. Yes, sir. Q. He came up and called you? A. Yes, sir. Q. What did you say to him? A. He called me and said, `Come here'; and I said, `No, you come here.' Q. What did he say to you? A. He said, `No, I'm not coming there; I know all about that I want to know.' Q. What else did he say to you? A. I don't know; he muttered out something, I don't know just exactly the words he did say. Q. You couldn't tell what he said? A. Well, I know that that's what he said; he calling me to come here and I called him and I said, `No, you come here,' and he said, `No, I know all about that I want to know; I am going right now to see the county attorney'; and he turned and went back to his car from the road. Q. Will you tell this jury if that's all he said upon that occasion? A. I think that's all he said; he may have said more, but I think that's all he said. Q. I will ask you if he didn't tell you that no, he knew all about that he wanted to know, that he knew for some time that they was going to find a gun out there? That it was all fixed and he wasn't going to have anything to do with it? A. I don't think he said that, either; he said that up in the road after we overtaken him. Q. And that he was going to report it to the county attorney? A. Yes, sir. I told him if he knew anything that the county attorney ought to know that he ought to go and tell him, and he says, `Well, I know it.' Counsel for Defendants: If the court please, we move to strike out all of that conversation that took place up in the road there, between the representative of the county attorney and the witness. By the Court: Overruled. Counsel for Defendants: We except." *Page 92 
Evidence relative to the conversation between Johnson and Shaw was also elicited from the witness A.T. Walker, which evidence was admitted without objection and exception, except that the defendant moved to strike the statements testified to as having been made by Charlie Johnson for the reason that such statements were incompetent, irrelevant, immaterial, hearsay, and prejudicial to the rights of the defendant, at which time the court announced that he would reserve his ruling.
At the conclusion of the trial, the court ruled on the foregoing motion to strike as follows:
"By the Court: Gentlemen of the jury, on yesterday an objection was made to the introduction of certain evidence concerning statements made by one Charlie Johnson, or Charles Johnson, at the time of the search that — or on finding of a pistol at the scene of the killing in this case, to which objection the court at that time reserved the ruling. The court at this time will sustain the objection to the statements made or purported to have been made by Charlie Johnson at that time and the same are stricken and withdrawn from your consideration and are not to be considered by you for any purpose."
It is contended by counsel for the defendant that, although the court, in response to the defendant's request not to consider the statements alleged to have been made by Charlie Johnson to those present at the time of the finding of the pistol, withdrew said statements from the consideration of the jury, nevertheless the damage had been done by their admission and the error could not be cured by a mere withdrawal of the same from the jury's consideration.
Counsel overlook the fact that this evidence was admitted first without objection and exception by counsel who represented defendant at the trial of this case. Counsel also overlook the fact that as a part of the direct examination *Page 93 
of the first witness called to testify as to the finding of this pistol, counsel for the defendant elicited part of this conversation had with Charlie Johnson. The rule is well established that "when a witness on direct examination is interrogated relative to a conversation, the opposing party is entitled to draw out all the material portions of such conversation pertinent to the issues on cross-examination."Gibbons v. State, 5 Okla. Cr. 212, 115 P. 130. In the body of the opinion in the foregoing case, it is said:
"The appellant contends that the court erred in refusing to allow him to have the witness, Mrs. Notson, (formerly the wife of the deceased, Renfro) give the whole of a conversation had between her, the defendant, and one Reddington, after having permitted a portion of the conversation containing alleged threats to go to the jury in chief. We think this contention is well taken. The general rule is that when a conversation is gone into in chief, all the material portions pertinent to the case can be drawn out on cross-examination. In the case of U.S. v.Knowlton, 13 N.W. 575, the Supreme Court of North Dakota says: `No rule is plainer than that a party has the right, upon cross-examination, to have given all other parts of the same conversation not given on the examination in chief which will serve to explain or modify the tendency of that part testified to in chief.' This statement of the rule is sound and expresses our view. In the case of Sager v. State, 11 Tex. App. 110 [11 Tex.Crim. 110], the court says: `When the state has put in evidence a portion of the conversation between the defendant and another, the defense has the right to prove the whole of it on the same subject.' See, also, 142 U.S. 691. In the 11th Pacific, 811, in the case of Watrous v. Cunningham, the court says in the syllabus: `Where a witness on his examination in chief testifies to a part of a conversation had by him at a certain time and place, the entire conversation is admissible in evidence on cross-examination' — and in the opinion: `When a witness has related anything which he said at a certain time and place and under a given state of facts, it is competent to *Page 94 
have him state all be uttered on such occasion.' See, also, Walshv. Patterson, 59 Neb. 645, 81 N.W. 853; Metzer v. State,39 Ind. 596; Patrick v. Crowe, 15 Colo. 543, 25 P. 985; People v.Warren, 122 Mich. 504."
In the instant case, the court did not rule adversely to the defendant, but sustained the motion of the defendant to strike the alleged incompetent evidence from consideration by the jury. This was all the trial court was called upon to do, and this was the only ruling that he could make under the circumstances, as counsel for the defendant had let this evidence go in without objection and exception, and it was only by a motion to strike that it could be withdrawn from the jury's consideration. The condition is not presented, therefore, where the court admits incompetent and irrelevant evidence over the objection and exception by the defendant, and this court is not called upon to construe as error any action of the trial court adverse to the defendant.
If the trial court's ruling was error in this particular, the action taken was favorable to the defendant, and the defendant will not be heard to complain in this court of action by the trial court which was made at his request. It is perhaps due to counsel who represent the defendant in this court to state that they did not participate in the trial. We find no merit in the foregoing assignment of error.
It is next contended that the trial court committed prejudicial error in permitting the county attorney to cross-examine the witness Clemmie Valentine as to acts of immoral conduct with men other than the deceased. The particular evidence complained of is set out in the brief of counsel for the defendant as follows:
"Q. Do you know Jim Coleman? A. Yes, sir. Q. Did you ever go down on the creek with Coleman? Counsel for Defendant: If the court please, we object to that as not *Page 95 
the proper cross-examination, incompetent, irrelevant, and immaterial. County Attorney: We think it is very material under the circumstances in this case. By the Court: I will let her answer. Counsel for Defendant: Overruled? We except. Q. Did you ever go down on the creek there — the creek that runs down by your house there, doesn't it? A. Yes, sir. Q. What is called, `Stickin' Creek'? A. Yes, sir. Q. Was you ever down on the creek there with Jim Coleman? A. Was down there while they was building that bridge. Q. How many times while they was building that bridge was you down there with Jim Coleman? A. Once. Q. More than once? A. Once is all I remember of. Q. Wasn't you down there twice? A. Not that I remember of."
Counsel argue that the foregoing testimony tends to show immoral conduct by the witness Clemmie Valentine with another than the deceased. We are not seriously impressed with the force of this argument. So far as the examination of the witness with reference to conduct with one Jim Coleman is disclosed, there is nothing in the evidence set out to indicate that anything immoral ever took place between the witness Clemmie Valentine and Jim Coleman. If they ever took a trip "down on the creek," the evidence shows it was to a place near where they were building a bridge in the daytime and that others were present.
We fail to see wherein this evidence could have prejudiced the defendant, and this court is not permitted to reverse a judgment of conviction on the ground of the improper admission of evidence, unless in the opinion of the court, after an examination of the entire record, it appears that there has probably been a miscarriage of justice, or a substantial violation of a constitutional or statutory right. Section 6005, Revised Laws 1910.
While the evidence admitted on cross-examination, as above set forth, was incompetent and shed no light upon the *Page 96 
issues under investigation, it failed to show any immoral conduct between Clemmie Valentine and Jim Coleman, and resulted in no prejudice to the defendant.
Lastly, it is contended that the court erred in permitting the state to introduce in evidence the testimony of Carter Barney given at the preliminary examination of the defendant. Barney was an eyewitness to the tragedy, and was one of the boys riding with the deceased just before the shooting took place. The record shows that a subpoena was issued and served upon Carter Barney, but that at the time of the trial he was at the home of his father, Frank Barney, in Kiowa county, confined to his bed with an attack of measles, and there was introduced a certificate of an attending physician to the effect that the witness Barney was sick in bed and unable to attend the trial, and that he was suffering at that time with the measles. Counsel admit that where the witness is out of the state or dead, his former testimony may be read in evidence, but contend that where the witness resides and is within the jurisdiction of the trial court, although sick and unable to attend at the time of the trial, his former testimony may not be read. The question here presented has been decided adversely to the contention of counsel for plaintiff in error in the case of Warren v. State, 6 Okla. Cr. 1,115 P. 812, where it is held:
"The constitutional provision which guarantees to a defendant the right to be confronted by the witnesses against him is fully complied with when the defendant has had the opportunity to cross-examine the said witnesses in a preliminary trial before a justice of the peace. When this has been done, and upon a subsequent trial of the said cause, if it is satisfactorily proven that such witnesses have, since the former trial, died, become insane, left the state, or that their whereabouts cannot with due diligence be ascertained, or are sick and unable to testify, the testimony of such witnesses *Page 97 
given upon said former trial may be proven upon the subsequent trial."
Finding no reversible error in the record, the judgment of conviction is affirmed.
DOYLE, P.J., and ARMSTRONG, J., concur.