## LUM REEVES v. STATE.

No. A-6310.   Opinion Filed July 28, 1928.
(269 Pac. 391.)

E. G. McComas, for plaintiff in error.

George F. Short, Atty. Gen., and Smith C. Matson, Asst. Atty. Gen., for the State.

DAVENPORT, J.   The plaintiff in error, hereinafter referred to as the defendant, was convicted in the district court of Beckham county, on a charge of assault with intent

to commit rape upon the person of Anna Laura Elliott, a female under the age of 16 years, and his punishment fixed at a term in the penitentiary for 5 years. The record was properly saved, and defendant has appealed from the judgment.

In order to determine whether or not the defendant was accorded a fair and impartial trial, it is necessary to set out in substance the testimony in the case.

Anna Laura Elliott testified that she was 15 years of age May 31, 1925; that her home was in Elk City, Beckham county, Okla., on July 25, 1925; that she saw the defendant in Elk City on the evening of July 25, 1925, in company with Bill Ward; that he hollowed and motioned to the witness and Vera Sitterding, and asked them where they were going, and they replied to a party, and defendant told them he was going to take Bill Ward to the party; they were in a large touring car; they got in the back seat; Bill Ward was standing by the side of the car. "Before they drove off they asked me to get in the front seat with Mr. Reeves, but I said I did not know him; Mr. Ward said, 'Meet Mr. Jones'; his name was Reeves; he is the defendant here, but I did not know him at that time; after we got in, we drove west on Third street and went west to the end of the pavement and then turned out Second and went up to the house where the party was to be held; when we met the defendant, we had been to the post office and started home; we were going to my home, and from there we were going to the party; after we left town on the highway, we drove out on the highway about 5 miles and stopped; we were just a little ways from the highway; after we stopped defendant begged me to get out of the car, and I said, 'I won't do it;' and he said he had some rubbers, and asked me to get out and start back like we were going back home, and said that we would go behind the car; he said he would use these rubbers; well he said he wanted some, he did not say what; I did not get out of

the car; he put his hand on my legs under my clothes; he did not hug and kiss me right at that time but had been; we were there about 30 or 40 minutes from the time we stopped the car until we left; he was trying to do this to me about 20 minutes; he quit when I got to hitting him, and he got in the back seat; Bill Ward got in the front seat with me; defendant was in the back seat and treating Vera pretty badly; I tried to get back there to help her, but Bill would not let me; the defendant commenced making the advances to me as soon as we stopped; he tried to open the door of the car, and I held it and would not let him; when we left there, the defendant drove the car; he tried to hug me on the road home; we went back to town the same way we came, and got out at Mr. Carver's some time about 10 o'clock in the evening; it was about 7:30 when they picked us up; Bill Ward asked us not to tell, and I told him I was, and Mr. Reeves said he did not care as he was going to leave that night on the train; Mr. Carver's house and my home is in the same block. I went home from Mr. Carver's house; Vera was with me."

On cross-examination, the witness stated as follows: "Q. What was the condition of your clothes when you got home? A. Well, my hair was torn up. Q. I said your clothing. A. Mine wasn't torn any." "This was July 29, 1925; it was raining when we got home; the defendant and Ward asked us to get in the car when they drove up; we knew Bill Ward; he had been going with Vera's sister; we had not asked them to take us to the party; neither of us told these boys that we wanted to take a ride; while Mr. Reeves was on the back seat Mr. Ward begged me not to tell; Mr. Ward did not do anything while Mr. Reeves was handling me; neither did Vera say anything; I don't know what they did; Mr. Ward did not attempt to stop Mr. Reeves from bothering me; I told my mother and she told father; my father did not tear my clothes or beat me up; the next morning I saw Mr. Clearman; I did not know what

Bill and Vera was doing in the back seat because I had to fight against him (referring to defendant); I had to use force and fight to keep him from doing something to me. My father scolded me."

Mrs. Joe Matt Elliott testified she was at home on the 29th day of July, 1925; the girls asked to take a walk. "The crowd was to gather at my house and go to the party; my daughter had not been in the habit of going out without her older sister; it was something like 10 o'clock when my daughter returned; Vera went right out, did not stay at my house; I told her to go home, her mother was looking for her; as soon as my daughter came into the house I saw she was white and her hair was torn up, and I asked where she had been, and she laid her head in my lap and told me all about it; she told me she did not know anybody but Bill Ward; that he introduced the other fellow as Mr. Jones and after they started she said to Mr. Reeves that she had seen him before at Mr. Bearfield's; she told me she asked him if he was not Mr. Reeves, and he said that he was not, that Mr. Reeves had a mustache and he did not; he said he was not drinking, that it was hair tonic you smell; my husband started to whip my daughter, and I told him to quit."

Vera Sitterding testified, in substance, that she and Anna Laura Elliott met the defendant and Bill Ward the evening of July 29, 1925. "They said they were going to the party and if we wanted to ride we could ride; Anna Laura Elliott got in the back seat; Bill ward introduced Mr. Reeves as Mr. Jones; they asked Laura to get out and get in the front seat, and they started south, and we told them we wanted to go back to the party; I knew Mr. Reeves was a married man, but I did not know the party that was introduced as Mr. Jones was Mr. Reeves at that time; the defendant is the man that was introduced as Mr. Jones and the man that was riding in the front seat with Anna Laura Elliott; when we got out about 5 miles he turned

the car like he was going to turn around and killed the engine and turned out the lights; I did not see what happened in the front seat, nor did I hear anything said; the defendant and Anna Laura was sitting in the front seat; it looked like he was talking to her; I was talking to Mr. Ward; we stayed there about 10 minutes; Mr. Reeves got out of the front seat and got on the back seat; he acted like heh tried to get me out."

On cross-examination, the witness testified they were coming from town and the parties asked them if they were going to the party, and they said they were, and they said, "Get in"; "We got in and they went up by the party, and from the party went south on the highway to the regular Sayre and Elk City highway; I did not know anything unusual was happening between Anna Laura Elliott and Mr. Reeves; I could not tell what he was doing; she did not scream or hollow, nor raise any disturbance very loud; I don't remember of hearing anything; she acted kinda like she was scared; when we got back to town we drove back to where the party was and from there home; if the party had been on we would have stopped there, but the party as over."

J. P. Elliott testified for the state, in substance: "I am the father of Anna Laura Elliott; when I came in from work that evening my daughter was at home; I was tired and laid down, and when I got up she was not there; I next saw her about 10 o'clock in the evening; she was home; she was crying when I went in; I had been down town to hunt her; I did not go into the matter with her; I went after the boys."

"Question by the County Attorney: I will ask you whether or not, as soon as this case was filed, if you have been approached on the subject to not come here and testify or prosecute this case? A. I have.

"By Mr. McComas: We object to that as incompetent and irrelevant.

"The Court: Let him answer, for, unless you connect the defendant with it, he won't be responsible for what somebody else did. If it was the defendant or some agent of his, you may use it.

"Q. We will let defendant answer 'Yes' or 'No.' Did any one come to you and represent he came from the defendant?

"By Mr. McComas: Objected to as incompetent, irrelevant, and immaterial.

"The Court: Overruled.

"By Mr. McComas: Exceptions.

"A. They did.

"Q. Who was that person? A. Doc Donald.

"Q. What statement, if any, did he make to you? A. He made the statement, he said, 'Elliott,' he said, 'I can give you $100 not to come down there,' he said, 'You won't get justice,' and he said, 'I could give you $100 if you won't come.'

"By Mr. McComas: If the court please, we would like to ask a question.

"A. (continues): And he told me he could give me $100 not to come.

"The Court: Did he tell you that the defendant had anything to do with that? A. No, sir; he did not say.

"The Court: Gentlemen of the jury, you will not consider that statement binding on the defendant. There is no evidence so far to show that he had anything to do with it. It would be unjust to charge him with that statement made by a man by the name of Donald."

On cross-examination, witness stated that he believed his daughter's statement when she came in and told her mother that night, and he went out to hunt the fellows. This is, in substance, the testimony on behalf of the state.

The defendant on his own behalf testified, in substance, that he was the defendant in this case; that on the 29th day of July, 1925, he was section foreman of the M.

K. T. Railroad. "We were just driving, and the best I can remember—I am not acquainted with the streets—we were driving north, me and Bill; we were in the front of the car the best I can remember they hollowed and asked us to ride; we stopped the car and both the girls got in; Ward got in the back seat and the Elliott girl clumb over in the front seat with me; I believe I had seen the Sitterding girl, but I was not sure; when they got in the car we was going to take a ride; they said, 'Let us ride'; that is all they said; we drove on; they did not say anything about wanting to go by the party; she said she wanted to go riding; it was about 9 o'clock in the evening; we went about 5 miles on the Sayre highway until we come to the corner where it turns, and went probably 300 yards and stopped on the highway; when we stopped we were just laughing and talking; there was nothing went wrong between us that I know of; I did not make any indecent proposals to Miss Elliott: we were stopped out there 20 or 30 minutes and came back to town; we first went to the party when we come back; the girls went up to the porch, and we left; me and Mr. Ward went back to the depot to meet my wife; I am a married man, have four children."

On cross-examination, witness stated he had lived in Elk City something like a year; he was section foreman of the M. K. T. Railroad. "Am now working with the T. P. west of Sweetwater, Tex.; am a married man and have four children; the girls hollowed at us, and we stopped, and they got in the car, and we drove out in the country about 5 miles on the main highway; when we stopped, we were headed west I believe; I was driving; I did not pull out to the side of the road; the girls wanted to go back, and we turned around and went back; I did not make any indecent approaches to these girls, none whatever; the 20 or 30 minutes we were there we were just sitting there talking; there was something said about our ages, and I believe Miss Elliott asked Ward how old he was, and he said

about 18, and she asked me how old I was, and I said about the same; and she said we are all about 18; I do not remember anything else we talked about; we turned around and came back home; I cannot remember exactly anything else we talked about while out there; we did not take the girls back home; we took them to the party; we stopped the car by the gate, and the girls got out, and we drove on."

W. E. Ward, called as a witness for the defendant, testified that he met the girls about 8:30 or 9 o'clock about one block west of the Baptist Church on Broadway. "The girls hollowed at us, and we whipped right around the corner and stopped, and they come and crawled in the back seat; they got in the car to take a ride; we said something about going to the party; we started up that way, and when we got there we drove on; we drove out the highway I think about 5 miles and stopped the car; there was nothing unusual transpiring up until that time; it was not very long; we stayed there 10, 15 or 20 minutes; I was in the back seat; I did not see Mr. Reeves and Miss Elliott at the time; I just did not pay any attention to them; I did not see Mr. Reeves make any motion or do anything that would indicate he was trying to make an assault upon these girls; could not hear very much of the conversation; there was something said about our ages; after we were there 15 or 20 minutes we turned around and came back to town; we never did leave the highway; Mr. Reeves never did get in the back seat with Miss Sitterding; he never got out of the car at any time, and I never heard anything unusual."

On cross-examination, witness stated that he talked with Mr. Clearman, the county attorney, the day after the alleged offense. Witness was asked the following question:

"Q. I will ask you whether or not, did you tell Mr. Clearman that Mr. Lum Reeves got in the back seat with Vera Sitterding? A. I wouldn't say for sure, but I am pretty sure he did not. The Court: He did not ask you that. Listen to his question. A. About all I can remember

of the conversation was about our age; I did not tell the county attorney I heard a conversation between Anna Laura Elliott and Lum Reeves, when Reeves asked for some, and she told him she did not want to get knocked up, nor did I tell him that I got over in the front seat and talked to Anna Laura Elliott while Reeves was in the back seat; I did not get in the front seat, nor did I tell the county attorney I did."

C. S. Clearman, county attorney, called in rebuttal, stated that he was county attorney of Beckham county on the 29th day of July, 1925; that he had occasion to talk with W. E. Ward July 30, 1925. "After this occurrence I was called to Elk City, and I talked to Mr. Ward about the case, and he told me that Mr. Lum Reeves got in the back seat of the car after fooling around in the front seat for a while, and after that I asked him what the conversation was at that time, and the only conversation he could remember was that Mr. Reeves asked Miss Elliott to give him some, and she spoke up in a real pert way and said that she was afraid of being knocked up; I talked to him a little bit, and said, 'You did not hear that, did you?' and finally he admitted that he did not, but that some one had put those words into his mouth."

"By Mr. McComas: We object to that, and move the answer be stricken. The defendant could not be bound by it.

"Q. That was all the conversation? A. Yes, sir; well, there was some other conversation.

"Q. Was it pertaining to this case?

"The Court: That conversation is not admissible except as you have asked the witness about it. It is merely a matter of impeachment, not a matter of evidence. It goes to the credibility of the witness."

H. C. Newby was called in rebuttal for the state; testified that on the 30th of July, 1925, he had a conversation with Mr. Ward in Elk City. "Mr. Ward stated in my presence that about the only conversation he heard

was Mr. Lum Reeves asked Anna Laura Elliott to give him some, and she answered by saying that she did not want to be knocked up. Mr. Ward further stated that Mr. Reeves got out of the front seat and got in the back seat."

On cross-examination, the witness stated in a conversation that took place out southwest of the jail in Elk City he was charged with being out with these girls; he did not threaten Ward or charge him with assault with intent to commit rape; the county attorney never said anything about it.

W. E. Ward was recalled, and stated that he did not make the statement as sworn to by the county attorney and Mr. Newby, at the jail in Elk City. "They told me I was subject to the same thing they were going to try to get Mr. Reeves on; they had me scared up; they was telling me I had to swear in this case."

This is, in substance, the testimony on behalf of the defendant.

The defendant alleges ten errors committed by the court in the trial of his case. The first, second, seventh, ninth, and tenth errors will be considered together as they relate to the question of the sufficiency of the evidence, the overruling of the demurrer of the defendant, and the overruling of defendant's motion for a new trial and in arrest of judgment.

The record in this case discloses a peculiar condition. We find two girls of immature years who had gone to the post office on the evening of the alleged offense and were returning to their home for the purpose of attending a party at a neighbor's home; two men, one of whom the girls had seen before, the other an absolute stranger, a married man with a wife and four children, was introduced to the girls by a fictitious name. The testimony on

behalf of the state shows that the men called to the girls and asked them to take a ride; defendant's testimony tends to show that the girls asked for a ride. Be that as it may, the girls were taken into the car, where the defendant and Bill Ward were riding, the prosecuting witness in this case was placed in the front seat with the defendant and the other girl in the back seat with Ward. The testimony on behalf of the state tends to show that the girls advised the men they were going to a party and the defendant denies that. All agree that, instead of going to the party, they drove down the street by the house where the party was to be held and continued to drive on until they were out in the country about 5 miles from Elk City, where the defendant in this case, who was driving the car, turned, as though to turn the car around in the road, and, when partially around, stopped the car and turned out the lights. The defendant in this case made indecent proposals to the prosecutrix, and then assaulted her by putting his hands on her legs under her clothing. Ward and Miss Sitterding who were in the back seat did not hear the conversation that took place between the prosecutrix and the defendant, but Miss Sitterding claims that, when the defendant got out of the front and got in the back seat with her, the prosecutrix seemed to be scared or excited. The testimony of the prosecutrix is that, on the trip out, and before the car was stopped, the defendant was hugging and kissing her against her wishes. The defendant insists that nothing improper took place while they were out where the car was stopped; they were only talking and laughing; the only thing he could remember they discussed were the ages of the respective parties, and the prosecutrix mentioned they were all about the same age.

The prosecutrix in this case is a young girl of immature years just past 15 when this alleged offense happened. It is not necessary or essential to the conviction

that the state prove the assault with force or violence by overcoming resistance. All that is necessary for the state to prove is that the defendant assaulted the prosecuting witness with intent existing in his mind at the time to have sexual intercourse with her. The intent is inferred from the actions of the defendant. The prosecuting witness being under the age of 16, it was legally impossible for her to consent to the assault or to an intercourse, nor could she by any act of hers waive the assault, provided the defendant's act in law constituted an assault if committed on a female over the age of consent, without her consent and against her wishes. Lee v. State, 7 Okla. Cr. 141, 122 P. 1111; Bouie v. State, 9 Okla. Cr. 345, 131 P. 953.

The age of the prosecuting witness was such that all good citizens should have sought to protect her. The defendant, it seems, forgot his marital vows and his children, and was willing to go out joy riding with the prosecutrix and if possible to persuade her to have sexual intercourse with him; he told her he had rubbers and wanted her to get out of the car and go back behind the car. It is clearly shown from the record that the defendant did not desire the prosecutrix to know his real name, and that he and Mr. Ward both knew at the time he introduced the defendant to the prosecutrix that they were not telling the truth and was not giving the correct name of the defendant. The testimony in this case is amply sufficient to show that defendant committed the assault upon the person of the prosecutrix, and that he intended to persuade her to yield to his passion and cohabit with him. The surrounding circumstances were such that it is difficult to believe that the defendant would have undertaken to cohabit with the prosecutrix against her consent; the other parties being in the rear seat of the car in which the prosecutrix and defendant were sitting.

The testimony of the prosecutrix is positive, and definitely shows that, when the defendant assaulted her and told her he wanted some, that she refused, and that the defendant continued his assault on her until she began hitting him and compelled him to stop. The circumstances surrounding the drive to the country tend to show that they had an ulterior motive when they drove these young girls to the country, without the knowledge or consent of their parents. Walker v. State, 20 Okla. Cr. 319, 202 P. 799; Ravenscraft v. State, 23 Okla. Cr. 361, 214 P. 946.

Where the evidence is conflicting, it is the province of the jury to determine whom to believe and whom to disbelieve. The weight of the evidence and the credibility of the witnesses are for the jury. This court is convinced there is sufficient evidence in the record on behalf of the state to warrant the jury in returning a verdict of guilty of the offense so attempted.

The defendant in his sixth assignment urges that the court committed an error in permitting the county attorney, over the objection of the defendant, to ask the witness J. P. Elliott, father of the prosecutrix, as to a conversation he had with Doc Donald when Doc Donald told the witness he could get $100 if he would not appear at the trial. The record discloses that, when the question was propounded to the witness, the defendant interposed an objection to the testimony and the court permitted the witness to answer. The court then asked the witness if the man making the proposition to him claimed to represent the defendant, and witness said "No." The court then sustained the objection of the defendant, and directed the jury as follows:

"Gentlemen of the jury, you will not consider that statement binding on the defendant. There is no evidence so far to show that he had anything to do with it.

It would be unjust to charge him with any statement made by a man by the name of Donald."

The action of the court in sustaining defendant's motion to exclude the testimony improperly brought out by the county attorney was timely. This court will not reverse a judgment on that ground unless the action of the court was so arbitrary and prejudicial to the rights of the defendant as to amount to an abuse of sound judicial discretion. In view of the court's action on the question, we do not think that the rights of the defendant were prejudiced. Valentine v. State, 16 Okla. Cr. 76, 194 P. 254.

There are other errors assigned by the defendant, but the view we take of this record we do not deem it necessary to consider them.

In our opinion, there is ample evidence to sustain the judgment; however, under the record before us, we believe the punishment assessed is excessive, and the judgment is therefore modified by reducing the punishment from 5 years to a term of 2 years in the penitentiary, and, as so modified, is affirmed.

DOYLE, P. J., and EDWARDS, J., concur.