## W. Z. GRAHAM v. STATE.

No. A-4399.    Opinion Filed Nov. 24, 1924.

(230 Pac. 763.)

(Syllabus.)

1. **Appeal and Error—Discretion of Court—Continuance in Homicide Case.** An application for continuance in a homicide case is addressed to the sound discretion of the trial court, and unless an abuse of such discretion clearly appears, this court will not reverse the judgment for refusal to grant a continuance.

2. **Appeal and Error—Witnesses—Questions as to Conviction of Crime to Affect Credibility—Harmless Error in Sustaining Objections to Questions—Error to Be Preserved by Showing Answers of Witness.** Under the statute (section 585, Comp. Stats. 1921) a witness may be asked whether or not she has been convicted of a particular crime for the purpose of affecting her credibility. Held, that sustaining the state's objections in this case to the question was harmless; further, held that, when objections to a question are sustained, the record must contain some showing as to what the answer of the witness would have been had she been permitted to answer the question.

3. **Evidence—Homicide—Statements of Deceased, Unless Part of Res Gestae, Inadmissible—Where State's Witness on Cross-Examination Interrogated as to Statements of Deceased on Day of Homicide, Whole Conversation Admissible on Redirect Examination.** In a prosecution for murder, statements of the deceased are not admissible in evidence unless they were a part of the res gestae. However, when a witness for the state, on cross-examination, is interrogated relative to a conversation with the deceased on the day of the homicide, the state on redirect examination had the right to show all of the conversation.

4. **Witnesses—Defendant Testifying in Own Behalf—Waiver of Privilege as to All Pertinent Legal Matters.** When a defendant takes the witness stand in his own behalf, he waives his constitutional privilege of silence in so far as all matters legal and pertinent to the case on trial are concerned.

5. **Same—Scope of Cross-Examination.** When a defendant takes the witness stand and testifies in his own behalf, the prosecution has the right to cross-examine him with the same latitude as any other witness. His cross-examination is not confined to a mere categorical review of the matters stated in the direct examination. He may be asked any question on cross-examination pertaining to the matter at issue, or that goes to his credibility as a witness.

6. **Same—Extent of Irrelevant Cross-Examination to Test Memory or Affect Credibility Largely Discretionary.** The extent. to which a witness may be cross-examined as to matters not relevant to the issue, for the purpose of testing his memory and of affecting his credibility, rests largely in the discretion of the trial court.

7. **Appeal and Error—Harmless Error—Improper Admission of Evidence.** A judgment of conviction will not be reversed on appeal on the ground of the improper admission of evidence, unless, in the opinion of the court, after an examination of the entire record, it appears that there has probably been a miscarriage of justice or a substantial violation of a constitutional or statutory right guaranteed to the defendant.

8. **Homicide—Evidence Held to Sustain Conviction for Murder Without Death Penalty.** In a prosecution for murder, the evidence examined, and held sufficient to support a conviction without the death penalty, and that no prejudicial error was committed on the trial.

Appeal from District Court, Craig County; A. C. Brewster, Judge.

W. Z. Graham was convicted of murder, and he appeals. Affirmed.

See, also, 20 Okla. Cr. 51, 200 Pac. 878.

James S. Davenport and O. L. Rider, for plaintiff in error.

George F. Short, Atty. Gen., and Baxter Taylor, Asst. Atty. Gen., for the State.

DOYLE, J. The plaintiff in error was convicted of murder for having shot and killed A. W. Love, on the 5th day of August, 1921, and his punishment assessed at imprisonment for life at hard labor. He has appealed from the judgment rendered upon such conviction. The defense was justifiable homicide. The undisputed facts are as follows:

A. W. Love, deceased, and the defendant, W. Z. Graham, both lived in the town of Bluejacket, within a block of each other. A difficulty had arisen between them by reason of an alleged insulting remark made by the defendant to the wife of the deceased about four months previous to the homicide.

On the morning of the day of the homicide, the defendant's cow strayed into Mr. Love's yard and Mrs. Love tied the cow to the henhouse. The defendant Graham appeared, and Mrs. Love refused to let him take his cow. During the altercation that followed the defendant cut the rope and turned his cow loose. That forenoon Mr. Love, with his wife and Mrs. Drake, drove to Vinita in a Ford car. They returned to Bluejacket that afternoon about 3 p. m. A little later, as they crossed the main street going north, Mr. Love stopped the car, got out, and started toward the defendant, who was walking east on the south side of the main street. Mrs. Love called her husband back, and he turned back, and then again walked towards the defendant. A few words were spoken, and the defendant shot A. W. Love, using a 38-caliber revolver. The bullet entered the cavity of the right eye and lodged near the back of the skull. Mr. Love staggered and fell unconscious. He was taken to the hospital at Miami, where he died about 9 o'clock that evening.

Mrs. Ozie Dake testified: That she went to Vinita with Mr. Love and his wife, arriving there about noon. That they returned to Bluejacket and stopped at Mr. Love's blacksmith shop for about 30 minutes, and then went to Mr. Brookshires, a justice of the peace, where Mr. Love got out of the car, then came back and got into the car and returned to his blacksmith shop, leaving there they started to her place. That, as they crossed the main street going north, somebody hollered and Mr. Love stopped the car. That she looked back and saw Mr. Graham on the south side of the street. Mr. Love got out of the car and Mr. Graham told him to come over, he wanted to see him. Mrs. Love told him not to go, but to come back, and he came back to them. Then Mr. Graham called again, and Mr. Love started walking towards him. Mr. Graham had his right hand in his pocket. He said something to

Mr. Love that she did not understand, and Mr. Love said, "You are not fighting a woman this time; you are fighting a man." Then Mr. Graham pulled a gun out of his pocket and shot Mr. Love. That they were 8 or 10 feet apart when the shot was fired. That Mr. Graham had on a blue shirt and overalls and was in his shirt sleeves, and Mr. Love had on just a white shirt and pants. That when the shot was fired Mr. Love staggered and fell. At that time Mrs. Love was almost to her husband and Mr. Graham said to Mrs. Love, "God damn you, stop, or I will shoot you," and pointed the gun at her, and she fainted and fell.

Mrs. Love, widow of the deceased, testified; That she tied up a stray cow that morning and shortly afterwards saw the defendant standing near her barn and she ordered him off the premises. He said he was going to take the cow and she told him to let the cow alone and he grabbed her by the arm, took out his knife, opened it, and cut the rope. That she grabbed the rope and he shoved her down and drove the cow away. That forenoon her husband drove her and Mrs. Dake to Vinita, and they returned to Bluejacket in the afternoon. That she was in the back seat with Mrs. Dake, and as they crossed the main street at the bank corner her husband stopped the car, and the defendant said: "Come here, Red, I want to see you." That "Red" was a nickname for her husband, and her husband went halfway across the street, turned and came back towards the car, and the defendant called him again. Her husband started towards the defendant and said, "You are not fighting a woman this time," and the defendant shot him with a revolver, which he pulled out of his front overalls pocket. That her husband threw up both hands just as he shot him. That she ran to him, saying, "My God, he has killed my Wess;" and the defendant threw the gun on her and said, "Yes, and, God damn you, I will kill you."

C. H. Orr testified that he was cashier of the Bluejacket Bank and was sitting in front of the bank when a Ford car stopped in the street and he saw Mr. Love get out and walk around the car; some one called him back and he turned around and went back and then started toward Mr. Graham who had stopped on the crossing; that Mr. Graham shot Mr. Love as he approached him.

Robert Hawkins testified: That he was standing in front of his place of business on the south side of Main street, and saw Mr. Love drive across the street and stop and get out of the car and start back across the street. Mr. Love turned, and went back to the car and dropped something in, then started towards Mr. Graham and he was about 7 feet from him when Mr. Graham fired the shot.

A. J. Jones testified: That he saw Mr. Graham coming up the street, and saw the car cross the street, and next saw Mr. Love pass the lamp post in the middle of the street. He was swinging his arms, then both said something, he could not understand. When Mr. Love got something like 6 feet from him, Graham wheeled and fired a shot and Love fell. Mrs. Love ran to her husband. Mr. Graham turned back and said, "Hands off, I will attend to it," and jerked his gun out and she fell over backwards. Then Mr. Graham walked on down the street.

D. M. Corbin testified: That he heard the shot fired, and ran out of his shop and saw Mr. Graham on the sidewalk. Mrs. Love said, "Oh, you have killed my Wess;" and Mr. Graham threw the pistol down on her and said, "Yes, and, God damn you, I will kill you," and she dropped down on the ground. That he went to Mr. Love, and with others carried him over in the shade of the garage, and they searched him and found a knife in his pocket, a pocketbook, checkbook, and some other little trinkets.

Lula Ballard testified that she was the wife of A. D. Ballard, and identified the revolver offered in evidence as her husband's gun that was taken from her place by Mrs. Graham, defendant's wife, about 9 o'clock the morning of the day of the homicide.

On the part of the defense, William Odell testified that he was standing in front of the Davis grocery store, and saw Mr. Graham walking east, and saw Mr. Love stop his car on the north side of the street. Mr. Love got out of the car with something like a hammer in his hand and walked about 10 feet towards Mr. Graham, then turned back and put it in the car, then started back toward Mr. Graham; that Mr. Graham said something he did not understand, and Mr. Love asked him how he would like to fight a man, and Mr. Graham said, "All right," and Mr. Love said, "You are not fighting a woman now;" that Mr. Graham had both hands in his pockets and Mr. Love had his right hand in his pocket; that he would judge they were between 6 and 8 feet apart when Mr. Graham fired the shot; that Mrs. Love was coming towards Mr. Love and Mr. Graham threw the gun on her and said, "and, God damn you, I will shoot you," and Mrs. Love fainted.

E. A. Ragsdale testified that he was standing in front of Sabler's garage, across Main street from the bank, and saw Mr. Graham coming from the west on the south side of Main street; that Mr. Love was crossing the street when he stopped the car on the north side, got out with a hammer in his hand and walked back about 10 steps, the women said, "Don't take the hammer," and he went back and put the hammer in the car, turned and came back south, walking towards Mr. Graham, and Mr. Graham turned and shot him.

Luther Overstreet testified that he saw Mr. Love drive across Main street, stop, get out of his car with a hammer, and

walk out in the street. The women said, "Don't take the hammer, bring it back." Mr. Love laid it in the car, then went on across towards Mr. Graham, and asked him if he wanted to fight a man, and told him that he was not monkeying with a woman now, and Mr. Graham shot him. On cross-examination he said that as Mr. Graham came up the street his right hand was in his right overalls pocket, and he just whirled and shot; that Mrs. Love was coming across the street and Mr. Graham pulled the gun on her and said, "God damn you, stop, or I will shoot you, too," and she fainted.

Wilber Wallace testified: That he was standing in Sabler's garage and saw Mr. Love stop his car, get out and pick up a hammer and then put it back in the car. Mr. Graham was just passing in front of the garage. Mr. Love started across the street towards Mr. Graham, and when about 5 or 6 feet of him Mr. Graham shot him. That he did not hear what was said.

As a witness in his own behalf W. E. Graham testified:

"My cow was running loose in the yard, dragging a rope and she got away. I found her tied to Mr. Love's henhouse. I started to untie her and Mrs. Love came running up to me. I asked her what the damage was for the cow, and she told me to get off her premises. I told her I would, but I wanted to take the cow with me. She struck me across the arm with the handle of a hammer; then I took it away from her. She was pulling on the rope, so I took my knife out and cut the rope between her and the cow. She grabbed the end that was to the cow. I hit the cow with the hammer. The cow broke and ran, and jerked her down. As I passed along the house I threw down the hammer. Something near an hour from that time I saw Mr. Love in front of my barn. He said not a word, but went straight up on Main street. Between 3 and 4 o'clock in the afternoon I saw him near the north side of Main street, and I was traveling east. He stopped his car and got out and hollered, 'Hold on there, Graham.' He come

over a little ways from the car, west of the turn post, coming directly towards me in a real fast walk, and he said, 'You beat my wife up this morning, you son of a bitch; I will let you try your hand on me,' and ran up with his hand in his pocket and made a move with his arm. I thought he was going to draw a gun and I drew my gun and fired. There was a question in my mind but what he aimed to do me great bodily harm and shoot me was the idea I had about it. I did not say anything to him, or call him 'Wess' or 'Red.' I never drew a gun on Mrs. Love. I found out that he had been trying to borrow a gun from the neighbors that morning. I learned it from Frank Haggerty, Prof. Edwards, and Al Kimbel.''

On cross-examination he stated that he did not see Mr. Love have a hammer and did not see anything in his hands; that after he had shot her husband he told Mrs. Love she was the one that needed it, just for her aggravating this case, and for pushing it onto him. Against the defendant's objections he was asked questions and answered as follows:

''Q. Was the cow trouble the only trouble you have had? A. No, sir.

''Q. What was the other trouble? When did this trouble start between you and Mr. Love? A. Well, I will commence about the second week in February of this year. Mr. Love told me there was lots of ducks down on Crow creek. I went down the creek, and I started through his lot, and somebody hollered at me. I went up to the south side of the house, to the window. Mrs. Love was there. She asked me some questions about her man, what he was doing, or how he was getting along. I told her he was at work most of the time. She was in a splendid humor, and I asked her if she was not feeling sporty. She wanted to know what I meant. I told her I really didn't mean anything I reckoned; that I did not have the dictionary for it. She took it as an insult, and I begged her pardon. She insisted on being mad, and I turned and walked away.''

On redirect examination, he testified that in March Al Kimbel told him that Love was very mad at him, and that he

was going to "hit me with a hammer if I passed his shop." I asked Kimbel to see Love and fix it up, and I would talk friendship, and he did, and with Kimbel I went down to Love's shop the next morning, and we agreed, as the saying is, to bury the tomahawk, and it was all off, and we called it all off. Before Mr. Kimbel came there that evening, Prof. Edwards came down there and asked me if I realized that my life was in danger, and I told him I had a tip to that effect from Mr. Ragsdale. A. L. Edwards was at that time a teacher in the Bluejacket schools.

Lincoln Edwards testified that he had a conversation with A. W. Love in his blacksmith shop in March or April this year, and Mr. Love said that Mr. Graham was a damned old son of a b——, and that he was laying for him all day, and he was going to shoot him on sight, and that he would get him before the day was out. About half an hour later he met Mr. Graham, and told him what Mr. Love had said, and Mr. Graham asked him for his revolver, and he gave it to Mr. Graham. The next day Mr. Graham brought the gun back, and said he had settled the whole matter peacefully with Mr. Love.

Several witnesses qualified as character witnesses, and testified that the defendant's reputation as to being a peaceable and law-abiding citizen was good.

The refusal of a continuance is assigned as error and relied upon for a reversal. When the case was called for trial. November 28, 1921, the defendant filed a motion for continuance on account of the absence of Rube Jenkins, whose home was at Bluejacket, and who, if present, would testify that the deceased, A. W. Love, came to him on the morning of the day of the killing in the town of Bluejacket and wanted to borrow of him a pistol or gun, and stated that he was going to kill the son of a bitch before night, referring to the defendant;

that said Jenkins communicated this statement to the defendant shortly before the killing; that he had caused a subpoena to issue to the sheriff of the county, and said sheriff was unable to make service upon the said Jenkins, for the reason that said Jenkins was and is at this time outside of the state; that this defendant has endeavored to ascertain where said Jenkins may be found, but was unable to do so, by reason, he believes, of the fact that the family of said Jenkins are hostile to this defendant and unwilling to give him said information.

Continuances ought always to be granted when, from the showing, justice requires it to be done to enable the defendant to procure all legal and competent evidence necessary for a fair presentation of the defense, where due diligence to obtain the same has been shown. Here the case had been pending for some time. The defendant had nearly four months from the time of his arrest in which to prepare for trial, and no special effort appears to have been made to find this absent witness. The granting of a continuance rests largely in the discretion of the trial court, and a refusal to grant a continuance will not constitute reversible error, unless there has been such an abuse of discretion as to deny the defendant a substantial right. The record shows the alleged testimony of the absent witness to be merely cumulative. It follows that no error was committed in overruling the defendant's motion for a continuance.

A number of errors are assigned on rulings of the court in the admission and exclusion of certain evidence. Upon cross-examination of the witness Mrs. Dake, she was asked:

"Q. Mrs. Dake, have you ever been convicted of larceny in a court in the state of Oklahoma?.

"By Mr. Davis: The state objects as incompetent, irrelevant, and immaterial.

"By the Court: Sustained.

"Mr. Rider: The defendant excepts. I think that is all this time, I may want to recall her for another matter.

"By the Court: All right."

Our statute provides (section 585, Comp. Stat. 1921) that a witness may be discredited by showing his conviction of a criminal offense, and the court erred in sustaining the state's objection. Key v. State, 10 Okla. Cr. 206, 135 Pac. 950. However, there is very little conflict in the testimony of the witnesses for the state and those of the defendant in this case, and for this reason we think the error complained of is harmless. It is also shown by the record that no predicate was laid to support this assignment. It is a well-settled rule that, when objections to a question are sustained, if it is desired to reserve the question as to the competency of the testimony sought to be introduced for the determination of this court, the record must contain some showing as to what the testimony of the witness would have been if permitted to answer the question. White v. State, 4 Okla. Cr. 143, 111 Pac. 1010.

Complaint is made that the witness Mrs. Dake was permitted on her redirect examination to relate conversations had between witness and the deceased on the way to and returning from Vinita. It appears that upon her cross-examination the following questions were asked and answered:

"Q. Mr. Love was mad then, wasn't he? He was mad at Mr. Graham, wasn't he? A. I suppose he was; yes.

"Q. And he had been doing a great deal of talking about Mr. Graham that morning? A. Well, he had been talking on the way about him. He was talking about the trouble.

"Q. Wasn't Mr. Graham practically the whole subject of your talk on the way to Vinita? A. Yes, sir; he was.

"Q. After you got back to the shop, Mr. Love kept talking about Mr. Graham? A. No; he did not; he was talking business then."

On redirect examination, against the defendant's objection, witness was asked, "what was that conversation about?" and answered:

"Well, he told me about Mr. Graham going to his house in the spring, and said he insulted his wife, and had a gun in his hands, and then kept talking on about the trouble they had had, and that he had tried to stay out of the way of it and keep this trouble down, and he said he moved out of Mr. Graham's building to stop the trouble and keep out of it, and that he moved over there and then sent his wife away for a visit, and thought maybe, when she came back, they would be moved, and that there would be no more trouble. Then this trouble had come up, and that he did not know any steps to take, except just let the law take hold of it."

To be admissible against one accused of murder, statements made by the deceased must be so immediately connected with the homicide as to be a part of the res gestae. It would be error to admit the testimony objected to as a part of the direct examination of the witness. Here, however, it appears that the defendant on cross-examination of the witness sought to show threats by the deceased. We think the state then had the right to show all of the conversation. If it was error, it was invited, and the defendant cannot be heard to complain. Valentine v. State, 16 Okla. Cr. 76, 194 Pac. 254, and cases cited.

It is also contended that the court erred in permitting the prosecuting attorney to cross-examine the defendant upon matters to which he made no reference in his direct examination, and upon subjects and in a manner prejudicial to the defendant's rights; that this testimony related to a previous difficulty, not with the deceased, but with the wife of the de-

ceased, and the defendant was not on trial for an assault on her, and must have been introduced for the sole purpose of degrading the defendant. The rule obtains in this jurisdiction that a defendant taking the witness stand and testifying in his own behalf, may be cross-examined the same as any other witness. He, like any other witness, may be asked questions pertaining to the matter at issue or that would go to his credibility as a witness. His cross-examination is not confined to a mere categorical review of the matters stated in the direct examination. He may be asked questions irrelevant and collateral to the issue for the purpose of testing his memory, affecting his credibility and the weight of his testimony.

In Castleberry v. State, 10 Okla. Cr. 504, 139 Pac. 132, it is said:

"The doctrine that a witness may be cross-examined as to matters going to credibility may well be regarded as an exception to the rule that cross-examination is to be confined to matters touched on in the examination in chief, and the limits within which either party may cross-examine upon matters not strictly relevant, but which affect the credibility of the witness, is largely within the discretion of the trial court, but the privilege of degrading a witness by proof of disreputable conduct, not connected with the facts on trial, is one so liable to abuse that it should be closely guarded and allowed only upon the exercise of sound judicial discretion, and then only to affect the credibility of the witness."

It is a general rule that evidence of other offenses is not admissible for the purpose of showing that the defendant is guilty of the particular offense charged. This rule is so well established that citation of authorities in its support is unnecessary, but certain exceptions to it are equally well established. One of which is that where such evidence directly tends to prove some material element of the crime charged, it may be admitted. State v. Rule, 11 Okla. Cr. 237, 144 Pac. 807.

Another well-settled rule is that any previous act of the defendant may be admitted in evidence against him provided that it has any logical or legal tendency to prove any matter which is in issue. The general principle is thus tersely stated by Cushing, Chief Justice, in State v. Lapage, 57 N. H. 245, 24 Am. Rep. 69:

"Any act of the prisoner may be put in evidence against him, provided it has any logical and legal tendency to prove any matter which is in issue between him and the state, notwithstanding it might have an indirect bearing, which in strictness it ought not to have, upon some other matter in issue."

The defendant in his direct examination referred to his relations with the deceased following his misconduct towards the wife of the deceased, and offered proof of numerous threats made by the deceased against him based on that occurrence. We think the evidence on cross-examination of the defendant was properly admitted as tending to show the relations existing between him and the deceased, to show the state of feeling between them, and to show the defendant's state of mind towards the deceased at the time of the killing.

It is also urged that the court erred in permitting the wife of the deceased to testify that he left surviving him three children, aged seven, six, and two years. We think it may be said in sound reason that evidence of this kind tends to show that the defendant, having a family, would naturally exercise more caution before entering or provoking a serious difficulty, and that this evidence was properly admitted.

Exceptions to the refusal of the court to give certain instructions requested by the defendant and exceptions taken to the instructions given by the court are called to our attention and urged as error. It appears that the court by its instructions submitted the issue of murder, manslaughter in the first degree, and the law of justifiable homicide in self-defense. A

careful examination of the charge of the court shows that the jury were fully instructed upon every phase of the case. It follows that the instructions requested were properly refused.

Finally it is insisted that the verdict is not sustained by the evidence, in that the testimony of the defendant shows that he honestly believed that he was in danger of losing his life or receiving great bodily harm when he fired the fatal shot. The right to take another's life in self-defense is not to be tested by the honesty or good faith of the defendant's belief in the necessity of the killing, but by the fact whether he had reasonable grounds for such belief. Carefully considering the whole testimony, we feel constrained to say that there is not a single extenuating feature in this case. On the contrary, the defendant's entire conduct, from beginning to the end, shows "a heart regardless of social duty and fatally bent on mischief." In our opinion the verdict is amply supported by the evidence.

It may be observed here that it is as true now as it was in the days of the Hebrew prophet that he who sows the wind must needs be content if he be compelled to reap the inevitable whirlwind.

The judgment of the lower court is affirmed.

MATSON, P. J., and BESSEY, J., concur.