## W. H. HOWARD v. STATE.

No. A-9539.   Oct. 12, 1939.
(94 P. 2d 947.)

446

J. B. Maxey, of Atoka, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Jess L. Pullen, Asst. Atty. Gen., for the State.

DOYLE, P. J. This appeal is from a judgment of conviction rendered in the district court of Atoka county, in pursuance to the verdict of a jury finding W. H. Howard guilty as charged in the information and assessing his punishment at two years' imprisonment in the state penitentiary. Appellant, W. H. Howard, was charged jointly with H. H. Howard of the crime of larceny of live stock. December 6, 1937, the case came on for trial and the defendants presented to the court their motion for continuance, which was overruled. Thereupon the

defendants asked for a severance, which was granted, and the state elected to try defendant, W. H. Howard, first.

The information charges that in Atoka county, on or about the 6th day of July, 1937, "the defendants did in said county and state, at the date above named, willfully, unlawfully, wrongfully, knowingly, stealthily, fraudulently and feloniously take, steal and carry away from the possession of one J. W. Gibbons, one black sow, with one eye out, marked crop in right ear and crop and steeple fork in the left ear; and one white sow, marked crop and small underhack in the right ear and crop and steeple fork in left ear; and one red barrow hog, marked crop and underhack in the right ear and crop and steeple fork in the left ear, and bob tailed, the personal property of the said J. W. Gibbons, without the knowledge or consent and against the will of him, the said J. W. Gibbons, the true owner thereof."

The evidence shows that on the date alleged, J. W. Gibbons lived on a farm in Atoka county, near the southeast corner of said county, and was the owner of several hogs; that on the evening of Tuesday, July 6, 1937, he missed the three hogs described in the information. He testified that on Friday he found where hogs had been loaded on a wagon; about a half or three quarters northeast of his home; that Saturday morning he went to the sheriff's office in Atoka and reported the theft of his hogs. Marion Son, deputy sheriff, then went with him to the place where the hogs had been loaded, and they trailed a wagon something like a mile and a half through the woods to the highway. Sunday morning they talked with appellant. He said that on Tuesday he went in the Flower's field and got some hogs. Marion Son asked him what he did with the hogs, and appellant said he sold the two sows and the bar to a fellow named Wilson, up at Oklahoma City, and cashed the check at Antlers; that he called Mr. Wilson at Oklahoma

City and he came down there, and with Mr. Son went with him to see appellant; Mr. Wilson said to appellant: "I understand you say I bought some hogs from you." Appellant said: "I did sell you some." Mr. Wilson said: "When did you sell them to me?" Appellant said, "About a week or ten days ago." That on July 19th, Marion Son came to his place and said he had found my hogs at Antlers, and they went to Antlers and found the hogs in Bob Hill and Roy Akard's lot, he identified them as his property and took them and now has them. That whoever took the hogs took them without his knowledge or consent.

Roy Akard testified that he lived at Antlers, engaged in the business of trading; that with Bob Hill they both looked at W. H. Howard's hogs and Bob Hill decided he would buy them; that it was a little after sun up when they bought the hogs; that W. H. Howard lives a little south of Farris and it is 16 miles from Antlers to Farris.

R. W. Hill testified that he bought three hogs of appellant; Roy Akard went in on half of them; that he paid W. H. Howard $40 for the hogs; that three or four days later Marion Son came there with Mr. Gibbons; that Bill Barrow, deputy sheriff from this county, was with them, and Mr. Gibbons identified the hogs as being his property and they gave the hogs to him.

Marion Son, deputy sheriff, testified that he went with J. W. Gibbons to investigate the loss of his hogs, and went to see how far we could trail the wagon from where the hogs were loaded, and trailed the wide tire wagon tracks to the road, that he had information that the Howard boys had been down in the bottom on Tuesday, and the following Sunday he talked with appellant.

He further testified:

"I first went over to where he was and left Mr. Gibbons in the car and told him we were looking for some hogs that Mr. Gibbons lost, and told him what mark they had, and I just made the statement to him, 'The other day when you

boys were in the bottom gathering these hogs, how many hogs did you get,' he looked at me a little while and said, 'We got three', and I said, 'What did you do with the hogs,' and he said, 'Well I sold the two piggy sows to a fellow named Wilson, out of Oklahoma City'; I asked him how he paid him, and he said he gave him a check for $14. I asked him if he didn't remember the man's name on the check, and he said he just remembered that it was Wilson. I asked him where he cashed the check; he said he cashed it at Antlers, and they charged him a dime for cashing the check, and I asked what kind of truck he was driving, and he said it was a blue International Pick-up. I asked him when he sold him those hogs, and he said, 'Wednesday, before this Sunday.' "

That he found that there was a hog buyer by the name of Wilson that lived down by Farris and talked to him, and found out that he had a brother by the name of Wilson that lived near Oklahoma City. That he had Mr. Wilson to come down there, and they went to appellant's place, and appellant admitted that the Wilson at Oklahoma City had not bought any hogs, but that Bill Wilson, that lived near Farris, had bought some hogs from him and gave a check for $14, and that was a month before, and appellant said that was the last hogs that he had sold; that several days later he went to Antlers and located hogs that tallied with the description that Mr. Gibbons had given him, went to the sheriff's office and got Bill Gardner to go with him, one of the hogs was in the sale lot and two were in the possession of Mr. Hill, that he told Mr. Hill that he was sure that those were the hogs that he had been looking for, then went straight out and came back with Mr. Gibbons, who identified the hogs as his, and told Mr. Hill the marks on the hogs before he looked at them, then they went back and looked at them and they agreed to turn the hogs to him, Mr. Hill mentioned about making an affidavit and Mr. Gibbons told him he was willing to do that any time he wanted him to.

Bill Wilson testified that he lives 12 miles east of Atoka; that in June he bought two hogs, sandy bars, from appellant and gave him a check for $14.

The defendant called eight witnesses, George Hamlett, Jewell Hamlett, Forney Burchfield, Calvin Standridge, Sam Wood, W. V. Esque, Elisha Parrish and Dave Howe. Their testimony was to the effect that the defendant's hog mark was and had been for years, a crop to the right ear, crop and steeple fork to the left ear. Several qualified as character witnesses, and testified that W. H. Howard's reputation in the community where he resided as to being an honest, law-abiding citizen was good.

The joint application of the defendants for a continuance was read to the jury as the deposition of the absent witness, in part as follows:

"That said witness, J. W. Wilkerson, if present, would testify that on about the 25 day of Sept. 1936 he moved into the house which had been formerly occupied by the defendant W. H. Howard. That the said Howard had recently removed from said house but had not yet taken his hogs away. That said hogs were in a pen at said place and witness examined said hogs and offered to buy them from said defendant, but that by reason of objection from the wife of witness at the price, he did not buy them. That witness examined said hogs closely, and there were several hogs in said pen, and among them a black sow marked crop in right ear and crop and steeple fork in left ear, with one eye either out or damaged. That there were also in said pen at said time a red barrow and a light sandy or white sow both marked in the same mark as said black sow. That said hogs were of the exact description of the hogs described in the information filed in this case. That thereafter said defendant hauled said hogs to the place to which he had removed. That thereafter said defendant hauled said hogs from the place to which he had removed to where his brother H. H. Howard lived near Boggy river, and that witness knew when he so hauled said hogs to said H. H. Howard, and knows the hogs described in the information were a part of the hogs he so hauled there. That witness knew the hogs of the said W. H. Howard, and knew said Howard's mark, and knows that all said Howards' hogs were marked with a crop in right ear and crop and steeple fork in left ear."

The defendant took the witness stand in his own behalf and testified that his mark was a crop to right ear and crop and steeple fork to left ear; that all of his hogs were marked in that way; that he let his brother keep twelve hogs on the halves, and he put an underhack in the right ear of six of his brother's; that he knows where J. W. Gibbons lives and had seen him twice before this case came up; that the hogs had been turned out on the range and he was down there two or three times after he let his brother have them; that he got word that they were in George Hamlett's field, and with his brother, Haskell, he went and got them; they caught them, tied them up and then went after the wagon and came and got them; that they caught them about one o'clock, and that night he carried them to Antlers and sold them the next morning; that they got to Antlers about 6 or 7 o'clock; that at that time he had 15 or 20 yet in the bottom, and seven or eight around the house, and he was the owner of the hogs described in the information. That he gave a mortgage on these hogs in which the mark of the hogs mortgaged was not the steeple fork; that the man who wrote it made a mistake and put down a swallow fork; that the hogs were actually marked a steeple fork; that when Marion Son and Mr. Gibbons came to see him about these hogs Mr. Son called him off to one side and wanted to know if he had been in the bottom after any hogs, and he told him he was last week and caught some hogs in the bottom; that Mr. Son told him the mark, and wanted to know if he had caught any with that mark, and he told him he had. Then he asked: "Who did you sell to?" and he told him, "I sold some to Wilson." That he never did tell him that he sold the hogs described in the information to Wilson, and he never did tell Mr. Son who he sold these hogs to. That he told Mr. Son he had the hogs caught and tied, and he hauled the hogs out of the bottom in a wagon, going through the bottoms until he hit the hill, and then followed the main road. That when he took these hogs from the range he knew they were his own hogs.

452

His cross-examination was in part as follows:

"Q. You told Marion Son you sold Wilson two sows? A. I thought they were at that time. Q. How come you didn't tell him about this Antlers sale—he came back to you two or three times and these two or three times you never told him you sold some hogs at Antlers, did you? A. He got mad and I wouldn't tell him anything. Q. Here is a chattel mortgage filed in the county clerk's office, is that the one you have reference to where you have it 'Swallow fork,' date December 26, 1936, where it says 'My entire bunch of hogs of various sizes, ages, colors and sex consisting of thirty head or more in all. Consists of 23 sows, 7 shoats. All marked crop in right and swallow fork in left'? A. I told him to put it 'Steeple fork.' Q. That is your mortgage and you signed it there? A. Yes."

Chattel mortgage introduced as Exhibit "A."

"Q. Here is another chattel mortgage February, 1935, back there before you signed that one (referring to other mortgage) you signed that? A. Yes. Q. In describing your hogs, 'my entire bunch of hogs of various sizes, ages, colors, and sex, consisting of ten head or more in all. All marked crop off right and swallow hack and crop off of left ear.' Do you know how it happened to be 'Swallow fork' in that one? A. I traded and bought an old sow that had that. Q. Did the bank make a mistake on that? A. I traded and bought them hogs on that one alright. It had the mark. Q. You say entire bunch of hogs—what about that under-hack in there, how come you didn't tell the bank about that when you made those mortgages? A. I let my brother take them on the halves."

Chattel mortgage introduced Exhibit "B."

"How far was this bottom from your house? A. From where I live it was four or five miles, I guess. Q. Have you ever been convicted of a felony and served a term in any penal institution? A. Yes, sir, we was both in jail together right down here."

Redirect:

"Q. What were you convicted for? A. Selling liquor. Q. How long ago was that? A. 1935."

The foregoing substantially shows both the state's and the defendant's theory of the case.

The first assignment of error is that the court erred in overruling the defendant's joint motion for continuance, without requiring the county attorney to admit that the statement of facts in the motion were true. Citing Madison v. State, 6 Okla. Cr. 356, 118 P. 617, Ann. Cas. 1913C, 484.

That case sustained the contention made, but the rule there announced was long since overruled by this court. Hargis v. State, 33 Okla. Cr. 283, 243 P. 986.

It is also contended that the court erred in its rulings in the admission of incompetent evidence, prejudicial to the defendant, over the objection of the defendant. And it is argued that it was error to permit the state to show on defendant's cross-examination that he had once been in a federal prison for selling intoxicating liquor, in that said offense does not carry with it that character of moral turpitude contemplated by law.

It is well established that conviction for a violation of the prohibitory liquor law may be shown for the purpose of affecting the credibility of the witness. Sec. 268, 12 Okla. St. Ann. § 381; Graham v. State, 28 Okla. Cr. 266, 230 P. 763; Gore v. State, 25 Okla. Cr. 214, 219 P. 153; Forester v. State, 36 Okla. Cr. 111, 252 P. 861.

It is also insisted that the court erred in giving certain instructions.

An examination of the record shows that no objection was made or exception taken to the instructions given by the court, and we find that the instructions so given fully and correctly covered the law of the case, and were as favorable to the defendant as he could have demanded.

Finally it is insisted that the verdict is contrary to law and is not sustained by the evidence.

This court has held repeatedly that it has no power to reverse a judgment of conviction upon the ground that

the verdict is not supported by the evidence, unless there is no substantial evidence tending to show the guilt of the defendant, or that the evidence so far fails to support the verdict that the necessary inference is that the jury must have acted from passion or prejudice, or have been controlled in reaching their verdict by undue influence.

In this case there is a direct conflict in the testimony for the state and that for the defense. The evidence for the state is sufficient, if believed by the jury, to authorize the conclusion that the defendant stole, as charged in the information, the three hogs, the property of J. W. Gibbons. If the testimony for the defendant is true, he should have been acquitted.

The trial court and the jury had all the witnesses before them and heard them testify and they decided that the defendant was guilty. It was for the jury to judge of the weight of the evidence, and the credibility of the witnesses and it is not for this court to substitute its judgment on the question of the weight of the evidence for that either of the jury or the trial court.

As we view the evidence the hogs in question were sufficiently identified as the property of the alleged owner, and it cannot with propriety and due respect for the law be held that there is an absence of competent evidence on which to base the conviction. The case was ably prosecuted and ably defended. It is seldom a record so free from error is presented to this court for review.

Our conclusion is that appellant had a fair trial and no error requiring a reversal is shown. The judgment of the district court of Atoka county herein, is therefore affirmed.

BAREFOOT and DAVENPORT, JJ., concur.