Larry Richard **FINK, Plaintiff in Error,**

v.

The STATE of Oklahoma, Defend-
ant in Error.

No. A–14278.

Court of Criminal Appeals of Oklahoma.
Feb. 25, 1970.

Rehearing Denied Oct. 2, 1970.

Dennis L. Pope, Enid, for plaintiff in error.

G. T. Blankenship, Atty. Gen., Hugh Collum, Asst. Atty. Gen., for defendant in error.

BUSSEY, Judge.

Larry Richard Fink, hereinafter referred to as defendant, was charged, tried and convicted in the District Court of Garfield County for the crime of Rape, was sentenced to life imprisonment, and from said judgment and sentence a timely appeal has been perfected to this Court.

On the trial the prosecutrix testified that she was 11 years old on February 28, 1966, and lived at home in Enid with her mother, step-father and brother. During the day she had attended school and after school had returned home and completed her household duties. She then called her mother at work and secured from her permission to go to Mrs. Gordon's, her Camp Fire leader, to secure additional Camp Fire candy to sell. She secured nine boxes of candy from Mrs. Gordon and enroute home with the nine boxes in a larger container, was stopped by the defendant on Davis Street. She testified that he was driving a light green Buick, and advised her that he knew her parents, offered to help her sell the candy and give her a ride in his car, ostensibly to take her to the homes of three ladies whom he said would buy her candy. She further testified that he was wearing a white shirt, slacks and loafer shoes. She traced the routes that he took, and although he took her by three houses, he never stopped, but would say, "Well, they are not home." She further testified that he went on a dirt road, came to a wooden bridge, stopped the car, and asked her if she would like to play a little game and advised her that if she would play the game he would buy all nine boxes of candy from her. Her testimony essentially was that the defendant raped her, and that penetration was accomplished. He then zipped his pants, told her to put her panties back on (she testified they were on her foot), got in the car and she described the route on

return. He stopped the car at the corner of Central Street, approximately a block and a half from her home, gave her the candy and turned around and drove off. She testified that when he stopped the car the first time, he removed the larger carton containing the candy to the back seat, handled one of the boxes of candy and then put it back in the larger carton.

Upon arriving at home the prosecutrix advised her mother as to what had happened, her mother called her step-father. Her step-father and a detective came to her home, she talked to the detective, and her mother then took her to the doctor.

The prosecutrix described the car as being light green, the front seat was torn with some tape on it, she described the dash of the car, a decoration hanging in the car with a picture of a girl in a bathing suit on it, and on the signal light handle, there was a ring. She testified that she drew a picture of the dashboard for the detective that same night. In describing the defendant, she stated that he had "kind of curley hair" and a cleft chin, and she pointed him out in court.

The fingerprint lifted from one of the candy boxes handled by the prosecutrix's assailant was identified by a fingerprint expert on the trial as being identical to the fingerprint of the defendant. The Enid Police Department, after having received the description of the assailant's car and his physical description, observed the defendant's car on the afternoon of March 11th, eleven days after the assault. They stopped defendant's automobile and noting the similarity of the car to the description given them by the prosecutrix and similarity in physical description, placed the defendant under arrest, took him to the police station together with his automobile, where they notified the prosecutrix's father who accompanied her to the police station. The prosecutrix viewed the defendant in a lineup with six others, who were all of the same general height, age and build; however, the defendant was the only member of the lineup wearing a coat and members of the fire department and police department were dressed without coats. Officers Hollen and Bowen, who were in the lineup, had been in the prosecutrix's home on the evening of the rape. The prosecutrix identified the defendant as her assailant at the lineup and during the trial. Testimony of the medical expert corroborated that the prosecutrix had been criminally assaulted.

The State's evidence established that the automobile driven by the defendant on the day of his arrest matched the description given by the prosecutrix down to the ring on the signal light handle and the deodorant pad hanging in the car with a picture of a girl in a bathing suit on it, and tape on the seat of the car.

After the State rested, the defendant admitted his presence in Enid on the day in question and by his testimony and that of his sister and other defense witnesses, attempted to establish that he could not have been present at the scene of the assault during the period of time the prosecutrix testified it occurred.

At the outset we observe that although considerable time during the defendant's oral argument was devoted to the pre-trial identification of the defendant in the lineup conducted at the police department, no objection was interposed when the prosecutrix testified on direct examination that she had seen the defendant at the lineup. Moreover, during the lengthy cross-examination of the prosecutrix which consumed 138 pages of the case made (direct and redirect examination consumed 53 pages), counsel for defense extensively and minutely questioned the prosecutrix concerning the circumstances surrounding the lineup identification. In addition to the cross-examination of the prosecutrix concerning the circumstances surrounding the lineup, counsel for defense cross-examined other witnesses extensively concerning the conduct of the lineup which we will set forth in the Appendix.

It would appear from the foregoing that the defendant has not properly preserved any objection to the lineup identification of the accused for review on ap-

peal, nor has he preserved any objection to the admission of the prosecutrix's testimony relating to the pre-trial identification of the defendant on direct examination by the State, for failure to object to the same; nevertheless, to prevent trial courts from committing error in future trials, we wish to reiterate the rule applicable in the instant case HAD TIMELY OBJECTION BEEN MADE to the direct testimony of the prosecutrix concerning the lineup identification. This well established rule is set forth in Syllabus 3 and 4 of Gillespie v. State, Okl.Cr., 355 P.2d 451, as follows:

"3. Identification of the defendant at a police lineup prior to trial and subsequent to the alleged crime is not an identification of the defendant as the one who committed the robbery, but testimony of an extra-judicial identification and is inadmissible as original testimony.

4. Failure of the defendant to object to the introduction of testimony and lengthy cross-examination relative to an extra-judicial identification may take the same out of the category of reversible error but if it appears that defendant was prejudiced thereby, will constitute grounds for modification."

We wish to further observe that since the lineup identification of the defendant, and his trial, occurred prior to the Supreme Court decision in United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), the rule there enunciated would have no application in the instant case, nor indeed would the decision of Foster v. California, 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969), be controlling in the instant case. In Foster v. California, supra, the facts surrounding the lineup and the pre-trial identification of the defendant were as follows:

"Except for the robbers themselves, the only witness to the crime was Joseph David, the late night manager of the Western Union office. After Foster had been arrested, David was called to the police station to view a lineup. There were three men in the lineup. One was petitioner. He is a tall man—close to six feet in height. The other two men were short—five feet, five or six inches. Petitioner wore a leather jacket which David said was similar to the one he had seen underneath the coveralls worn by the robber. After seeing this lineup, David could not positively identify petitioner as the robber. He 'thought' he was the man, but he was not sure. David then asked to speak to petitioner, and petitioner was brought into an office and sat across from David at a table. Except for prosecuting officials there was no one else in the room. Even after this one-to-one confrontation David still was uncertain whether petitioner was one of the robbers: 'truthfully—I was not sure,' he testified at trial. A week or 10 days later, the police arranged for David to view a second lineup. There were five men in that lineup. Petitioner was the only person in the second lineup who had appeared in the first lineup. This time David was 'convinced' petitioner was the man."

In reversing and remanding the California conviction, the Supreme Court of the United States stated in Syllabus 2:

"Judged by the 'totality of the circumstances,' the conduct of identification procedures [at a police lineup] may be 'so unnecessarily suggestive and conducive to irreparable mistaken identification' as to be a denial of due process of law."

In the instant case the defendant was viewed in a lineup with six other men of approximately the same age, height and weight, were dressed in shirts and ties and the only thing to distinguish him from the others was that he had on a coat. There was no personal confrontation between the defendant and the prosecutrix, nor was there a subsequent lineup thereafter and the defendant was not attired in clothing similar to that worn by the assailant at the time of the rape, nor is there one iota of evidence to indicate that any suggestion was ever made to the prosecutrix as to who she should identify in the lineup.

Accordingly, we are of the opinion that under the circumstances here presented, neither the testimony of the prosecutrix on direct examination relating to the pre-trial identification of the defendant, nor the conduct of the pre-trial lineup in which the defendant participated, were so prejudicial as to require reversal.

■ The defendant argued extensively in his brief and in oral argument, that the evidence was wholly insufficient to support the verdict and cited excerpts from the record which he asserts weaken the State's case. From the recital of facts as set forth briefly at the outset of this opinion, it is abundantly clear that although the evidence was conflicting, it presented a question of fact for the jury's determination. Under such circumstances we follow the rule laid down in the eighth paragraph of the Syllabus in Cottrell v. State, Okl.Cr., 458 P.2d 328:

"Where there is competent evidence in the record from which the jury could reasonably conclude that defendant was guilty as charged, this Court will not interfere with verdict even if there is a sharp conflict in the evidence and different inferences may be drawn therefrom since it is the exclusive province of the jury to weigh the evidence and determine the facts."

■■ This leads us to a consideration of defendant's assignment of error that the trial court erred in permitting the State, over the objection of the defendant, to introduce Officer Bowen's testimony as to the description given police by the prosecutrix on the evening of the rape. It is the defendant's position that this testimony was hearsay and as such inadmissible and he further asserts that the admission of this testimony constituted an effort on behalf of the State to impeach the prosecutrix's description of her attacker given during the trial on direct examination.

Here, again, we are of the opinion that this testimony, if error, does not constitute grounds for reversal, for it affirmatively appears on cross-examination of Officer Bowen by defense counsel that counsel sought to secure from Officer Bowen a description of the defendant's hands as detailed to him on the evening of the attack. The following appears in the record at page 398:

"Q. Now during the course of your investigation that evening, you learned the —some description, however it was given to you, of a vehicle that may have been involved, and other matters did you not?

A. Yes, sir.

Q. And did you learn that the suspect was alleged to have had cracked and rough hands and his fingernails were chewed off? Do you remember learning that information?

A. Not that evening. No, sir.

Q. You didn't hear that that evening? Did you hear it at any time during your investigation?

A. The only thing I remember about the hands was that they were—as I remember, they were described as being dirty or greasy type around the fingernails and such.

Q. But the fingernails were not chewed off or cracked? You don't remember that?

A. I don't remember that. No, sir."

We are of the opinion that the conversation related by Officer Bowen on redirect examination falls well within the rule enunciated in Adams v. State, 62 Okl.Cr. 167, 70 P.2d 821:

"When counsel for defendant, on cross-examination, makes inquiry as to conversations which are inadmissible, and inquires if a certain conversation did not occur, then the state is permitted on redirect examination of the witness to have him give the entire conversation."

See also Graham v. State, 28 Okl.Cr. 266, 230 P. 763.

The defendant alleges that the testimony of Officer Bowen impeached the testimony of the victim; however, from a careful review of the entire record, we could find no contradiction in the testimony, and are

of the opinion that this assignment of error is without merit.

■ It is lastly contended that the court erred in forcing defense counsel to acquiesce in a jury view of the automobile of the defendant and that there was error in the prosecutor asking a question of improper nature. The defendant was in no manner forced to acquiesce to the view of the automobile, and he specifically agreed to it. On page 855 of the case made, we find the following:

"MR. POPE: At this time the defendant will stipulate that the identification of the instrument panel of the defendant's car, impounded by the Enid Police Department on March 11th, 1966, has been put in issue in the trial of this case and that defendant waives any objections to and stipulates that the jury may be permitted to view the instrument panel of the defendant's car, which is now parked immediately in front of the Garfield County Court House."

MR. SWANSON: We ask, to further clarify the stipulation, that it is understood and agreed that there is no requirement that any other portions of the car be covered, disguised or—

MR. POPE: [Interposing] Well, now I don't want that part read to the jury. Between the parties, I will agree to it."

As to the impropriety of the question, we point out that the question was merely: "Do you have any objection to permitting this jury to view the instrument panel of your car?" We fail to see that this question was improper; however, even if it were improper any objection to it was waived when the defendant agreed to the jury viewing the automobile.

■ Having dealt with the assignments of error raised by the defendant on appeal, and finding no error sufficient to justify reversal, we are of the opinion that justice would best be served by modifying defendant's judgment and sentence from a term of life imprisonment to a term of forty-five (45) years imprisonment, and as

so modified, the judgment and sentence is Affirmed.

Modified and affirmed.

### APPENDIX

Page 302—cross-examination of Jerry Bowen:

"Q. What were you wearing, Mr.—or Sergeant Bowen, when you participated in the lineup? Do you recall?

A. A white shirt, tie and slacks.

Q. Were you wearing your glasses?

A. No, sir. I took my glasses off.

Q. You took your glasses off? And shirt, tie and slacks. What color slacks? Do you recall?

A. Either a gray or a charcoal, because that's what I have got.

Q. That is your color range, is it?

A. Yes, sir.

Q. All right, sir, and you removed your glasses?

A. Yes.

Q. Were you wearing a hat?

A. No, sir.

Q. You ordinarily wear a hat, don't you?

A. Yes, sir.

Q. And how many other persons participated in the lineup, as you recall, by number? Not by name, but by number.

A. Well, there was 7 of us all told, counting myself.

Q. 7, including yourself? Did the 7 include the defendant here, Mr. Fink?

A. Yes, sir.

Q. There was yourself and the defendant and 5 other persons?

A. Yes.

Q. All right. Now a couple of questions about this candy. * * * "

Page 518 of the case made—cross-examination of Eugene Graham:

"Q. Did you participate in the lineup of the defendant on the afternoon of the 11th of March?

A. I was there, but not in the lineup."

Page 531—cross-examination of Loyd Henderson:

"Q. Is there anything further that you did with regard to this investigation about which you have not told?

A. Well, I was present during the lineup that we had in the squad room there at the police station.

Q. When was that?

A. This was on the 11th—the afternoon of the 11th of March.

Q. Do you know how many persons were in that lineup?

A. Yes, sir. There were 7.

Q. Do you know who the 7 persons were?

A. Yes

Q. Can you tell us who they were?

A. Yes, sir. From left to right there was Jerry Bowen, Everette Brewer, a fireman, Floyd Klein, a fireman, Carl Bundy, a fireman, Vernon Glen, of the Crime Bureau, Larry Fink and Glen Hollen.

Q. And those are the 7 people who stood in a lineup?

A. Yes.

Q. Were you present when this lineup was conducted?

A. Yes, I was.

Q. Do you know who it was that viewed these 7 men in the lineup?

A. Yes. Lynda Parsons.

Q. Do you know whether or not anyone talked to her and told her about the lineup or anything of that nature?

A. She was told that there were several men in the squad room we wanted her to take a look at and view them to see if there was anyone similar to the person that she had had an incident with.

Q. Did anyone give her a description of any of the persons in the lineup prior to viewing them?

A. No, sir."

Further cross-examination of Loyd Henderson at page 547:

"Q. I take it then they were dressed in their regular gray khaki uniforms?

A. Yes.

Q. Gray shirt and gray trousers?

A. Yes. They were gray.

Q. And none of them were wearing ties?

A. No.

Q. And I believe you related that from left to right it was Detective Bowen, at that time—Jerry, and Brewer, Klein and Bundy, all three firemen?

A. Yes.

Q. Now how was Jerry dressed—Bowen?

A. Jerry had a white shirt and tie on. I don't recall the color of his trousers and such as that.

Q. Was he wearing his hat?

A. No, he was not.

Q. He wears glasses, doesn't he?

A. Yes.

Q. Did he have those on during the lineup?

A. No.

Q. He had his glasses off? And did Brewer, Klein or Bundy wear glasses?

A. Not that I recall.

Q. Now Glen—you had him next following Bundy in the lineup. Is that Vernon Glen of the Crime Bureau?

A. Yes, sir, it is.

Q. And at that time he was stationed in Enid, wasn't he?

A. Yes.

Q. He is now stationed over around Miami or vicinity—somewhere over there?

A. Yes.

\*      \*      \*      \*      \*      \*

Q. Did he have his glasses on?

A. I believe Vernon had his on.

Q. Did he have on a hat?

A. No hat.

Q. What color shirt and tie did he have on?

A. He had a light-colored shirt and tie and he had a light green sweater.

Q. Light green sweater?

A. Yes.

Q. Did he have on a hat?

A. No hat.

Q. And then you say then the defendant and then the seventh person in the lineup was Detective Hollen?

A. Yes.

Q. How was Detective Hollen dressed, if you remember?

A. Well, he came to work with a— I remember he had his white shirt and tie. He removed his coat.

Q. He did remove his coat?

A. Yes.

Q. And he had on a white shirt? And he was wearing a tie?

A. Yes sir.

Q. Did he have on a hat? .

A. No hat.

Q. And then let me ask you how was the defendant dressed?

A. Much as he is now. He had a dark suit on and white shirt and tie.

Q. No hat?

A. No hat.

Q. No glasses?

A. No glasses.

Q. Now, Captain Henderson, you have worked with Detective Jerry Bowen for some time. What is his general build, in your observation? Is he a slight-built person, would you say?

A. Slighter than I.

Q. Slighter than you? How about Firemen Brewer, Klein and Bundy?

A. They are close to my size.

Q. About your size? And Vernon Glen is probably your size or a little heavier?

A. He is a little huskier than I.

Q. And Detective Hollen is rather slight built, if I remember correctly.

A. Yes.

Q. And the defendant was between Glen and Hollen?

A. Yes, sir.

\* \* \* \* \* \*

Q. We have excused Jerry, so I'm going to ask you, what would you estimate Jerry Bowen's weight to be, Captain?

A. Probably 150 pounds; somewhere along there.

Q. 150 pounds and about five six, perhaps? Or seven?

A. Oh, six or—

Q. —seven, eight or somewhere along there?

A. Yes.

Q. About 150 pounds?

A. Yes.

Q. And Detective Hollen is about that similar build?

A. Yes.

Q. In height and weight?

A. Yes.

Q. And age, for that matter?

A. About that."

From the picture of State's Exhibit D (picture of defendant), the following appears:

"Name: Fink, Larry Richard

Age: 25 Ht. 5′ 9″, Wt. 160, Col. White, Hair Brn, Eyes Blue, Comp. Ruddy.

Marks, Scars: Sm sc knuckle rt index finger. Bad teeth. Appendix sc."

BRETT, Presiding Judge (specially concurring).

The medical testimony offered by the State clearly showed that the prosecutrix had experienced sexual intercourse with someone, before she was examined on the evening of February 28, 1966. Notwith-

standing defendant's alibi, the conflict of testimony offered was resolved by the jury. From the record, it also appears that the evidence was sufficient to sustain the jury's verdict.

However, as Judge Bussey points out in his opinion the defendant failed to offer objections to the testimony concerning defendant's lineup identification; and on cross-examination, defense counsel extensively examined the witnesses who participated in that lineup. (See Appendix to Judge Bussey's opinion). Nonetheless, this point was vigorously argued before the full Court.

As Judge Nix stated in Gillespie v. State, supra:

"The court is of the opinion that failure to object and pursuing the matter at great length on cross-examination takes said testimony out of the category of reversible error though it may well have influenced the verdict." p. 455.

Nonetheless, from the record one draws the conclusion that the lineup might have been improved upon, even though there is nothing contained in the record to constitute reversible error. Therefore, this writer is of the opinion, any doubt concerning this fact should be resolved in defendant's favor, which seems to warrant modification of defendant's sentence, and I therefore agree that defendant's sentence should be modified from life imprisonment to a sentence of forty-five (45) years imprisonment, and as so modified the judgment and sentence should be affirmed.

NIX, Judge (dissenting).

My primary concern is Syllabus 3, to the effect that failure to object to mention of a pre-trial lineup identification takes

same out of category of reversible error and becomes grounds to modify.

If improper testimony (an error) may have prejudiced the jury in assessing the severity of punishment, then it logically may require modification of the sentence, although not requiring reversal of the conviction because the error does not substantially affect a finding of guilty. However, if an error allows improper testimony which directly affects a finding of guilt, then modification is an inadequate remedy to correct the error. Thus, modification can only cure errors in admitting evidence which results in the jury "piling on" the punishment; but modification cannot cure an error in admitting evidence which directly influences a jury's finding of guilt.

In the instant case, testimony about a pre-trial lineup identification of defendant absent counsel, where defendant was distinctly dressed from the others in the lineup (all being either firemen in uniform dress or police officers), is evidence which directly reinforces the otherwise somewhat inconclusive evidence identifying defendant as the assailant. This evidence goes to the finding of guilt, not the severity of the punishment imposed. There remains the question that had such evidence been excluded, would the jury have been satisfied defendant was the assailant and thus convicted him. Such a question cannot be satisfied by modification.

I agree that the "lineup" conducted was improper and falls within Foster v. California, set forth in the majority opinion. But I disagree that a modification of the sentence will correct the error. Evidence regarding the "lineup" went directly to the guilt or innocence, thus the error could only be corrected by a re-trial of the case with such evidence excluded.